**COMMONWEALTH of Pennsylvania**

v.

**Mark K. HOAK, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 26, 1996.

Filed Aug. 12, 1997.

■

**Joseph S. HORVATH and Patricia M. Horvath, Petitioners,**

v.

**COMMONWEALTH of Pennsylvania, DE-PARTMENT OF TRANSPORTATION, BUREAU OF MOTOR VEHICLES, Respondent.**

Supreme Court of Pennsylvania.

Oct. 20, 1997.

### *ORDER*

Veronica A. Smith, Asst. Public Defender, Harrisburg, for appellant.

Lorinda L. Hinch, Asst. Dist. Atty., Mercer, for Commonwealth, appellee.

Before CAVANAUGH, J., CIRILLO, President Judge Emeritus, POPOVICH, JOHNSON, HUDOCK, FORD ELLIOTT, SAYLOR, EAKIN and SCHILLER, JJ.

EAKIN, Judge.

Mark K. Hoak appeals from the judgment of sentence entered in the Court of Common Pleas of Mercer County following his conviction for possession of marijuana and drug paraphernalia.

The issue before us is whether, after concluding a lawful traffic stop of appellant and stating "you are free to leave," a police officer's follow-up question constituted an investigative detention unsupported by reasonable suspicion, which vitiated appellant's response, an invitation to search. Because we find appellant's consent was given voluntarily and knowingly during a noncoercive encounter, we affirm the judgment of sentence.

The facts are undisputed. Around 1:45 a.m. November 22, 1994, Officer John Miller lawfully stopped appellant for straddling the center line, and driving erratically and with a burned-out taillight. After issuing a warning and returning appellant's driver's license and vehicle registration, Officer Miller told appellant he was free to leave. The officer then asked appellant if he would answer some questions; appellant said he would. The officer asked appellant what was in the luggage and duffle bag in the truck; appellant said, "Dirty clothes. Do you want to look?" When the officer asked, "Do you mind?", appellant said, "No." The officer searched, and found two bags containing marijuana, an envelope containing marijuana seeds and a marijuana cigarette in a stainless steel holder.

Charged with violating 35 P.S. § 780–113(a)(31) and (32), appellant moved to suppress the marijuana and paraphernalia; the trial court denied the motion. After a bench trial, the court convicted appellant of both offenses and sentenced him to a term of not less than twelve days nor more than one year imprisonment and to pay a $25.00 fine. This appeal followed, wherein appellant's sole complaint is the denial of his motion to suppress evidence; he contends his consent to the search was the product of an unlawful detention.

When we review the denial of a suppression motion, we must determine whether the record supports the court's factual findings. *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 524, 678 A.2d 342, 347 (1996), *cert. denied,* — U.S. —, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997). In so doing, we consider only the evidence of the prosecution and so much of the evidence for the defense as, when fairly read in the context of the record as a whole, remains uncontradicted. *Id.* If the record supports the suppression court's findings, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.*

Under both federal and state constitutional provisions, people are to be secure in their persons against "unreasonable searches and seizures." Pa. Const. art. I, § 8; U.S. Const. amend. IV; *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996).[1] While

---

1. Article I, § 8 of the Pennsylvania Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...."

appellant claims a violation under both constitutions, he fails to engage in any analysis pursuant to *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), suggesting how, under the instant circumstances, our state constitution provides greater protection than the Fourth Amendment. While the failure to brief *Edmunds'* four-prong test is not fatal, *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995), appellant's reliance on state constitutional provisions is at best vague, if articulated at all, and he provides no compelling reason to depart from Fourth Amendment jurisprudence in this case. Appellant's privacy interests—and his ability to cooperate voluntarily with police—are sufficiently protected by a totality-of-the-circumstances analysis.

 Not all personal intercourse between police and citizens involves seizures of persons. *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991);[2] *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769 (1996); *Commonwealth v. Ellis*, 541 Pa. 285, 662 A.2d 1043 (1995). There is no constitutional prohibition against the police questioning an individual in a public place. So long as a reasonable person would feel free to go about his or her business, the encounter is consensual and no reasonable suspicion is required. *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386; *Matos*, 543 Pa. at 461, 672 A.2d at 775; *Ellis*, 541 Pa. at 292–94, 662 A.2d at 1047. " 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)); *Matos*, 543 Pa. at 457–58, 672 A.2d at 774.

 Thus, individuals have been seized only if there is an objective reason to believe they are not free to end their conversation with police and proceed on their way. *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *Matos*, 543 Pa. at 458–59 n. 7, 672 A.2d at 774 n. 7 (Pennsylvania cases have consistently applied *Mendenhall's* objective test in determining whether police conduct amounts to a seizure or a mere encounter and are representative of state law pertaining to Article I, Section 8). Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, include

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Mendenhall*, 446 U.S. at 553–54, 100 S.Ct. at 1877. The crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would " 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)).

 Appellant essentially asks us to find it constitutionally impermissible *per se* for a police officer to ask questions of, or seek cooperation from, a citizen detained pursuant to a traffic stop. Appellant argues that asking if he "would answer some questions" after being told he is free to leave constituted an investigative detention because any rea-

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

**2.** In *Bostick*, Bostick was a passenger on a bus that was boarded by police. With no articulable suspicion, police asked Bostick if they could inspect his ticket and identification. After doing so police returned both to Bostick and asked for his consent, which they advised he could refuse, to search his luggage. Bostick consented, and the

search uncovered drugs. The Court stated that the appropriate inquiry was whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, "taking into account all of the circumstances surrounding the encounter." *Bostick*, 501 U.S. at 436–37, 111 S.Ct. at 2387. The Court remanded the case to the Florida courts to evaluate under the proper standard whether Bostick's encounter with police was a seizure, although the Court itself doubted that a seizure occurred. *Id.* at 437, 111 S.Ct. at 2387–88.

sonable person in his shoes would not have felt free to take the officer at his word and leave. With such a conclusion we cannot agree.

An *objective* review of the totality of these circumstances shows the officer issued only a warning, returned appellant's registration and license, and specifically advised him he was free to leave. This clearly communicated to appellant, or to any reasonable person, that all business with him was completed, the traffic stop was over, and he was free to drive away. Appellant's argument ignores these facts. The suggestion of an illegal detention also ignores the complete absence of any evidence that the officer blocked appellant's vehicle or spoke in a threatening tone; indeed, the officer had gratuitously issued a warning instead of a citation, an act connoting friendliness, not menace. The officer did not touch appellant in any way, display a weapon, or demand that appellant do anything; by the time the officer asked if appellant would answer some questions, the only show of authority was the officer's uniform.

■ Absent some coercive conduct by police, a request for cooperation or consent to search does not automatically convert an undeniably permissible encounter into an illegal seizure any more than the giving of *Miranda*[3] warnings transforms a non-custodial setting into a custodial one. *See, e.g., Commonwealth v. Morgan,* 416 Pa.Super. 145, 150 n. 2, 610 A.2d 1013, 1015 n. 2 (1992), *alloc. denied,* 533 Pa. 618, 619 A.2d 700 (1993) (gratuitously giving *Miranda* warnings did not transform consensual interrogation into custodial interrogation).

Appellant's position would mean citizens are legally incapable of consenting to a search at any time during or following a traffic stop. This court has held they cannot consent while the officer holds their identification. *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177, *alloc. denied,* 533 Pa. 598, 617 A.2d 1273 (1992). Appellant now asks us to hold they cannot consent after

their identification is returned and they are told they are free to go. We reject appellant's dangerously precedential assertion that all post-traffic stop questioning necessarily constitutes detention.

At oral argument, appellant and the Commonwealth cited *Ohio v. Robinette,* 73 Ohio St.3d 650, 653 N.E.2d 695 (1995) ("*Robinette I*"), *rev'd and remanded,* —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("*Robinette II*").[4] Appellant relies on *Robinette I* to echo his position that any subsequent roadside interaction with police could not be consensual; such interaction, he argues, must be deemed to have been influenced by a lingering authoritative aura of the earlier lawful traffic detention. This postulate assumes a reasonable person must believe the officer was lying when he said "you are free to go," a rather paranoid and legally unjustifiable assumption unsupported by general logic, much less by any articulable facts of record. Appellant just avoided receiving a citation through the good graces of the policeman. In the face of such consideration and courtesy, where are the facts that would cause appellant to disbelieve he was free to go? Where is the coercion that suggests continued detention to a reasonable mind? The reasonable mind does not allow for such subjective speculation, much less a paranoid analysis that disregards the facts.

Moreover, the validity of this presumed coercion necessarily rests on appellant's subjective, self-serving and post-arrest assessment, rather than on the requisite objective examination of the totality of the circumstances. This is reminiscent of Bostick's argument that, after being questioned aboard a bus, he "must have been seized because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs." *Bostick,* 501 U.S. at 438, 111 S.Ct. at 2388. The United States Supreme Court emphatically rejected this argument because the "reasonable person" test presupposes an innocent person. *Id.* Experience further belies this argument. Our jurisprudence is laden with cases where people con-

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** The United States Supreme Court decided *Robinette II* on November 18, 1996, just before argument to our *en banc* panel.

sent and confess for countless reasons, quite regardless of the consequences.

■ Similarly, however subtle or unintended, any implication that a police officer does not really mean it when he says "you are free to leave" impermissibly shifts the focus from objective facts to the officer's subjective intent, which "does not make otherwise lawful conduct illegal or unconstitutional." *Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (quoting *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); *see also Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions under the circumstances, not on the officer's actual state of mind at the time the challenged action was taken).

■ We find no reason to differentiate the post-traffic stop situation from the casual and constitutionally-permissible police/citizen encounter on the sidewalk. After the traffic stop here was concluded, any prior authoritative "aura" was gone, and appellant was in the same position as any other citizen who is lawfully in proximity with police and asked a few questions.[5] To hold otherwise gives a citizen who initiates contact by illegal driving a greater degree of constitutional protection than one approached along the sidewalk.

■ We see no analytical reason or constitutional necessity for such disparate treatment. In this Commonwealth, pedestrians and motorists alike are protected by the same constitutions. The inquiry into whether a particular encounter constitutes a seizure must consider all the surrounding circumstances to determine whether police conduct would have communicated to reasonable persons that they were not free to decline the officer's request or otherwise terminate the encounter. This inquiry applies to encounters that take place on a city street or a bus, in an airport lobby or along the road following a traffic stop. *See Bostick,* 501 U.S. at 439–40, 111 S.Ct. at 2389 (whether questioning aboard a bus constitutes a seizure requires a consideration of all the circumstances surrounding the encounter); *Robinette II,* —— U.S. at ——, 117 S.Ct. at 421 (whether consent to search during a lawful seizure is valid is question of fact to be determined from all the circumstances).

Further, singling out this particular type of encounter as rendering otherwise legitimate action unconstitutional *per se* would create a bright-line rule that should be expressly disavowed "in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment.'" *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality)). *Robinette II* specifically eschewed the bright-line rule that a lawfully seized defendant must be advised he is "free to go" before his consent to search will be deemed voluntary. *Id.*[6]

---

**5.** Indeed, this citizen was specifically advised he was under no further obligation; he had avoided a ticket, received all cards back, and been told he was "free to go." He had no *reasonable* cause to view a subsequent question as a form of detention.

Some question whether a reasonable person would feel free to walk away when addressed by a uniformed police officer, but our Supreme Court and the United States Supreme Court have upheld the constitutionality of such encounters between citizens and police. *See, e.g., Matos, supra; Ellis, supra; Bostick, supra.* These cases do not ignore the realities of a police-citizen encounter. Rather, they recognize that absent coercive or threatening conduct, police may lawfully seek cooperation from citizens who may voluntarily cooperate, whether out of a natural sense of obligation, or civic duty, or simple common courtesy. Because of the impossibility of evaluating the reasons for the responses of citizens in the endlessly varied circumstances that implicate the Fourth Amendment, the reasonableness of police-citizen encounters is measured in each case by a "reasonable person's" response and "in objective terms by examining the totality of the circumstances." *Robinette II,* —— U.S. at ——, 117 S.Ct. at 421.

**6.** The Supreme Court in *Robinette II* held consent may be constitutionally obtained in the absence of such a declaration, if the totality of the circumstances shows the consent was knowingly and voluntarily given. Here, the officer gave the very words that *Robinette II* holds unnecessary.

To find this officer's post-traffic stop conduct illegal creates a bright-line rule of another sort: People who are in contact with police because they violated the Vehicle Code may not be asked

Appellant relies on *Commonwealth v. Parker*, 422 Pa.Super. 393, 619 A.2d 735 (1993) and *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177, *alloc. denied*, 533 Pa. 598, 617 A.2d 1273 (1992). In *Parker*, a panel of this court relied on *Lopez* in concluding that after a lawful traffic stop, Parker was illegally detained, searched and seized. After stopping Parker for driving with an invalid license, police asked if they could search his vehicle for drugs or other contraband. Parker consented. Police seized a cassette tape in a tape recorder found under the driver's seat and, later, played the cassette without a warrant. The *Parker* panel found that while the stop was legal, detaining Parker after citing him for a traffic violation, seizing the tape (thus exceeding the scope of Parker's consent), and playing it without a warrant all violated Parker's constitutional rights. The panel specifically cited *Lopez* in holding that police illegally detained Parker because there was no reasonable suspicion of criminal activity. *Parker*, 422 Pa.Super. at 407–08, 619 A.2d at 742 (Hoffman, J., concurring).

What the *Parker* panel omitted in its recitation of facts and constitutional analysis, however, was any consideration of whether police had returned Parker's license and registration and whether questioning after such return could give rise to a consensual encounter. As the discussion in *Lopez* indi-

cates, whether police return or retain a person's license, registration or other papers is critical to properly resolving the issue raised herein.

In *Lopez*, police validly stopped Lopez for a traffic violation. *Without* returning his registration, rental car agreement and license, police continued to question Lopez regarding his origin, destination, purpose and duration of his trip, and then asked for his consent to search. A panel of this court found this "continued detention and investigation" an unreasonable Fourth Amendment seizure. *Lopez*, 415 Pa.Super. at 262, 609 A.2d at 182. The illegality resulted from the officer's retention of Lopez's license and other papers because while police held his license, Lopez was plainly *not* free to leave; indeed, he could not do so legally.[7]

The *Lopez* panel found *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), *overruled on other grounds*, 71 F.3d 783 (10th Cir.1995) persuasive. During a valid traffic stop in *Guzman*, an officer asked Guzman for his license and registration, which a computer check showed was in order. However, *without returning his license*, police began questioning Guzman and his wife. Like Lopez, Guzman was not free to leave while police retained his license, and was illegally seized under the Fourth Amendment.[8]

---

anything unrelated to the violation. We see neither need nor rationale for such "protection."

7. In *Commonwealth v. Pless*, 451 Pa.Super. 209, 679 A.2d 232 (1996), police issued Pless a warning, returned her license and registration, and advised her she was free to leave. They then asked Pless if she would answer some questions; Pless said she would and gave permission for her vehicle to be searched.

In finding the search and the encounter unconstitutional, the panel merely cited a rule of law from *Lopez*, which had cited *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), *overruled on other grounds*, 71 F.3d 783 (10th Cir. 1995), which had quoted *Florida v. Royer, supra*. As discussed below, the critical fact in *Lopez*, *Guzman* and *Royer* was that police had retained the defendants' licenses and papers during questioning; neither these defendants nor reasonable persons could leave under the circumstances. The *Pless* panel, like the *Parker* panel, however, never explicitly analyzed whether questioning, upon the return of vehicle documents after a lawful traffic stop, *may* constitute a consensual encounter, allowing for a consensual search.

8. *Guzman* and *Lopez* also relied on *Florida v. Royer, supra*. A nervous Royer was stopped for questioning in the Miami airport. Eventually, Royer consented to a search that revealed sixty-five pounds of marijuana. A plurality of the United States Supreme Court determined that

[a]sking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, *while retaining his ticket and driver's license and without indicating in any way that he was free to depart*, Royer was effectively seized for the purposes of the Fourth Amendment.

... What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room.... [A]ny consensual aspects of the encounter had evaporated.

*Royer*, 460 U.S. at 501, 503, 103 S.Ct. at 1326, 1327 (emphasis added). The plurality concluded that Royer's illegal detention vitiated his consent to the search of his luggage.

Interestingly, the *Lopez* panel ignored a subsequent Tenth Circuit Court of Appeals' case, *United States v. Werking*, 915 F.2d 1404 (10th Cir.1990), which addressed this issue and distinguished *Guzman* on this precise point. After validly stopping Werking and returning his license and registration, Officer Dyer asked if he was transporting contraband. Werking said, "No." Dyer asked if Werking would mind if he looked in the trunk. Werking said, "No," and allowed Dyer to look in some duffle bags where Dyer found marijuana.

The Tenth Circuit *Werking* court agreed Dyer's questioning *after returning Werking's license and other papers* did not violate the Fourth Amendment: "The initial investigative detention was concluded when Dyer returned Werking's license and registration papers. At this point, the encounter between Werking and Dyer became an *ordinary consensual encounter* between a private citizen and a law enforcement official." *Id.* at 1408 (emphasis added). The court clearly distinguished *Guzman:*

> Before Dyer asked Werking any further questions, he returned Werking's driver's license and registration papers....The officer in *Guzman,* however, did not return the defendant's license before questioning him. The defendant legally could not proceed on his way. He thus was seized within the meaning of the fourth amendment. In the present case, however, *Werking was free to leave the scene. He chose to engage in a consensual encounter with Dyer.* We hold that Werking's responses to Dyer's questions about transporting [contraband] were the voluntary cooperation of a private citizen with a law enforcement official and were not obtained in violation of the fourth amendment.

*Id.* at 1409 (emphasis added); *see also United States v. Lattimore,* 87 F.3d 647 (4th Cir.1996) (Lattimore engaged in consensual encounter with police after a traffic citation had been issued and his license returned; there was no illegal seizure to taint Lattimore's consent to a search).

While the paperwork during the traffic stops in *Lopez* and *Guzman* had been concluded, neither individual was free to leave, given the objective facts including police retention of license and registration. Neither individual was *advised* he was free to leave. Neither individual's encounter with police was transformed from nonconsensual (initiated by their illegal driving) to consensual. Clearly, *Lopez* and *Guzman* are not just distinguishable from the instant case, they emphasize two factors we agree are telling: retention of necessary documents, and absence of a statement indicating they were free to leave.

It is very small step from the presumption that no consensual exchange can follow on the heels of a concluded traffic stop to the complete outlawing of consensual encounters and consensual dialogues wherever they occur. The law is clear, however: Not every encounter, and certainly not the consensual post-traffic stop in the instant case, is a seizure. The Fourth Amendment and the Pennsylvania Constitution proscribe unreasonable searches and seizures; they do not proscribe voluntary cooperation. To characterize as a nonconsensual seizure appellant's encounter with police after the traffic stop concluded ignores the facts, the law and the application of the law to the facts. It is neither objectively reasonable nor constitutionally justifiable.

We find the events following the conclusion of the traffic stop flowed from appellant's voluntary agreement to answer some questions, and are not properly attributable to the stop itself. Appellant was no longer being detained when *he offered* to let police search his bags.[9] It is well-settled that

---

*Royer* is distinguishable from the instant case on two critical points: appellant's license and registration were returned to him, and he was advised he was free to leave *before* police asked if he would answer questions. The objectionable circumstances in *Royer* are simply not present in the instance case and confirm the significance of the instant factors.

9. The officer never asked to search appellant's bags; it was appellant who asked the officer whether he "want[ed] to look" in the bags. Moreover, when the officer asked "do you mind," a rather polite response, hardly evocative of coercion, appellant said he did not. Clearly, appellant freely, specifically, unequivocally and voluntarily consented to this search.

one of the specifically established exceptions to the requirement of a ... warrant ... is a search that is conducted pursuant to consent. [I]f a person voluntarily consents to a search, evidence found as a result of that search is admissible against him. The consent, however, must be given freely, specifically, unequivocally, and voluntarily. The question [of] whether [the] consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

*Commonwealth v. Washington,* 438 Pa.Super. 131, 136–37, 651 A.2d 1127, 1130 (1994), *alloc. denied,* 541 Pa. 638, 663 A.2d 690 (1995) (citations and quotations omitted); *see also Robinette II,* —— U.S. at ——, 117 S.Ct. at 421.

Since appellant was lawfully stopped and he voluntarily consented to a search during a subsequent permissible and lawful encounter, the evidence found was admissible, and we affirm the judgment of sentence.

Judgment of sentence affirmed.

JOHNSON, J., files a dissenting opinion which POPOVICH, J., joins.

FORD ELLIOTT, J., files a concurring and dissenting statement.

SCHILLER, J., files a concurring opinion.

JOHNSON, Judge, dissenting.

The Majority concludes that the trial court correctly refused to suppress the evidence obtained during the search of Hoak's luggage, and bases its decision solely upon the United States Constitution. I believe that we cannot reach the merits of this case because the record as certified to this Court contains no record of the evidence presented to the suppression court. Additionally, even if I assume that the record is sufficient for us to reach the merits, I believe that Hoak's consent was not effective under the Pennsylvania Constitution. I therefore dissent.

## I. *EFFECT OF DEFICIENCY IN THE CERTIFIED RECORD*

The Majority apparently assumes that there is a sufficient record upon which this Court can base a decision. Granted, the suppression court made the following findings of fact:

1) On November 22nd, 1994, at approximately 1:45 a.m. while on routine patrol, police officer observed defendant's truck straddling the center line, traveling in an erratic and jerky manner, with the taillight burned out.

2) Pursuant to these observations, defendant's vehicle was stopped; and although an odor of alcohol was detected, it was determined that the defendant was not under the influence of alcohol in violation of the Vehicle Code.

3) The defendant was asked to produce and did produce his license and registration to the vehicle, explaining the vehicle was owned by his father, Robert M. Hoak. Defendant was issued a warning for the burned-out taillight.

4) The police officer in the process of handling the stop observed luggage behind the seat and also knew who the defendant was and had heard several months prior from a confidential police informant that the defendant might be involved in trafficking of drugs or use of illegal drugs.

5) After giving [defendant] the warning and returning all of the defendant's cards, defendant was advised that he was free to leave. The officer then asked him if he would answer a few questions, and defendant said he would. Defendant was asked what was in the luggage and duffel bag in the truck, and the defendant said: "Dirty Clothes. Do you want to look?" The police officer asked: "Do you mind?" And the defendant responded: "No."

6) Upon search of the duffel bag and luggage, there was determined to be marijuana residue, a roach and drug paraphernalia, inter alia.

7) The officer was advised by Defendant Hoak that he was returning from a camping trip and that was the reason for the luggage.

Findings of Fact and Conclusions of Law, June 7, 1995, at 1–2. I surmise from the Majority's analysis that finding of fact number five supplies the factual basis upon which the Court announces its decision today. Yet, nothing in the record supports these critical findings of fact. There is no record of any evidence produced at a suppression hearing; in fact, nothing in either the certified record or the parties' briefs to this Court refers to a "hearing" on the suppression issue.

Moreover, I am struck by the Majority's assertions that certain evidence exists in this case. For example, the Majority states that "[t]he suggestion of an illegal detention also ignores *the complete absence of any evidence* that the officer blocked appellant's vehicle or spoke in a threatening tone.... The Officer did not touch appellant in any way, display a weapon, or demand that appellant do anything...." *Maj. op.* at 1267 (emphasis added). How can the Majority make these claims? Without a record of the suppression proceeding, I can neither confirm nor refute these constitutionally significant factual assertions. The Majority later states that Hoak's argument "assumes a reasonable person must believe the officer was lying when he said 'you are free to go,' a rather paranoid and legally unjustifiable assumption unsupported by general logic, much less by any articulable facts of record." *Id.* at 1267. Where does this quotation, "you are free to go," come from? Also, what "articulable facts of record" are the Majority relying on? Finding of fact number 5?

Unlike the Majority, I am stymied by the absence of a record of the proceedings before the suppression court and the absence of any reference to a suppression hearing, for it creates two equally possible scenarios: (1) Hoak failed to submit the transcript of the suppression proceedings to this Court; or (2) the suppression court either never ordered a record of the suppression hearing or never even held a hearing in the first place; thus there was no transcript for Hoak to submit. From the materials presented to us here, it is likely that an evidentiary hearing where evidence would be received under oath was never held.

We must address this matter because of our standard of review for suppression issues. As stated by the Pennsylvania Supreme Court, our standard of review *requires* us to examine the record of evidence presented to the suppression court:

> When reviewing a trial court's ruling denying a suppression motion, we must *first* determine whether the factual findings are supported by the record.... *If, upon such review, we conclude that the factual findings are supported by the record,* we are bound by those facts and are permitted to reverse the ruling only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Jones,* 546 Pa. 161, 176, 683 A.2d 1181, 1188 (1996)(emphasis added). Thus, in fulfilling our appellate responsibilities in this appeal, this Court must examine the effect of the absence of a suppression transcript. I do not believe that this raises an issue sua sponte in violation of *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975).

Under the first possible scenario, Hoak failed to order a transcript of the hearing. If true, Hoak clearly has waived his claim of suppression court error on appeal because he, as the appellant, has failed to produce a complete record for appellate review. *E.g., Commonwealth v. Chopak,* 532 Pa. 227, 236 n. 5, 615 A.2d 696, 701 n. 5 (1992). This Court's decision in *Commonwealth v. Dennis,* 421 Pa.Super. 600, 618 A.2d 972 (1992) is instructive here. In that case, as in the instant matter, we were faced with the absence of a transcript from the suppression hearing. We noted that under such circumstances Pennsylvania Rule of Appellate Procedure 1911 permitted us to "take such action as we may deem appropriate, including dismissal of the appeal." *Id.* at 620, 618 A.2d at 982. However, because this Court had the benefit of a transcript of a New Jersey hearing, which established the probable cause challenged by the defendant, appellate review of the denial of a motion to suppress evidence was not hampered in that case. *Id.* We accordingly declined the Commonwealth's invitation to dismiss the appeal. *Id.* Here, unlike in *Dennis,* this Court does not have the benefit of any such substitute transcript that might support the suppression

court's findings of fact. Dismissal therefore would be appropriate under this scenario. *Id.*

It is equally as possible, however, that the suppression court violated our Rules of Criminal Procedure, for nothing in this case would permit us to determine that a record of the suppression hearing was ever made. Indeed, we cannot even state with certainty that a hearing ever occurred. Pennsylvania Rule of Criminal Procedure 323 requires the suppression court to conduct a hearing on a defendant's motion to suppress evidence. *See* Pa.R.Crim.P. 323(e)–(f). The rule also requires the suppression court to make a record "of all evidence adduced at the hearing." *See* Pa.R.Crim.P. 323(g). If the suppression court failed to either hold a suppression hearing or make a record of the evidence presented at that hearing, this Court would be required to vacate Hoak's judgment of sentence. *See Commonwealth v. DeSantis,* 337 Pa.Super. 70, 486 A.2d 484 (1984)(failure of suppression court to enter findings of fact and conclusions of law violated Rule 323 and required the court to vacate the judgment of sentence and remand for a new suppression hearing).

From the materials before us, it is impossible to determine which of these possible scenarios actually occurred. Additionally, each possibility clearly would lead to a different result. Accordingly, I would remand this case to the suppression court for the limited determination of whether a suppression hearing occurred and, if so, whether a record of the evidence presented at that hearing was made. *See Commonwealth v. Rivera,* 339 Pa.Super. 242, 244–45 & n. 1, 488 A.2d 642, 643 & n. 1 (1985) (en banc) (where deficiency in the certified record prevented meaningful appellate review, and where it was impossible to determine whether the failure to complete the record was the fault of the trial court or the parties, remand was necessary to permit both the parties and the trial court to complete the record). I would also retain this en banc panel's jurisdiction over Hoak's appeal pending the suppression court's determination. *Id.* at 246, 488 A.2d at 644 (retaining jurisdiction).

## II. *MERITS OF HOAK'S CLAIM*

Even if I were to assume, as the Majority does, that a sufficient record exists to permit a resolution of Hoak's contention on appeal, I would nonetheless conclude that Hoak's consent was not effective under the circumstances. The Majority relies solely upon the Fourth Amendment to the United States Constitution in reaching its conclusion. Unlike the Majority, however, I conclude that Hoak's consent was ineffective under the Pennsylvania Constitution. Further, it is clear that an analysis under our constitution would support my conclusion adequately and independently of any conclusion reached under a Fourth Amendment analysis. *See Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

Before addressing the merits of Hoak's claim, however, I note that there are essentially two issues currently before this Court: (1) whether Hoak continued to be seized by the officer immediately following the return of his papers and after the officer advised him that he was free to leave; and (2) whether Hoak's consent to the search of his luggage was effective. The Majority apparently concludes, and the Commonwealth explicitly argues, that the resolution of the first question is dispositive of the second question. *See* Maj. op. at 1271; Brief for Appellee at 3. I disagree; I believe that even if Hoak were not seized at the time that the police questioned him about the contents of his luggage, his consent could nonetheless be considered ineffective under Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Gibson,* 536 Pa. 123, 133, 638 A.2d 203, 207 (1994)(holding that consent to search was ineffective even though defendant was not seized at the time that police sought his consent to search)

In resolving a claim that police conduct violates the Pennsylvania Constitution, a court must engage in the four-part test prescribed by our supreme court in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991). The test mandates an analysis of: (1) the text of the constitutional provision at issue; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other jurisdictions; and (4)

policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence. *Edmunds, supra,* at 390, 586 A.2d at 895. The test is designed to determine if the Pennsylvania Constitution provides a greater protection of individual liberty than does the Constitution of the United States. *See id.*

The Majority correctly notes that Hoak has failed to engage in any analysis pursuant to *Edmunds.* Since *Edmunds,* however, our supreme court has held that such a failure is not fatal to a claim under the Pennsylvania Constitution as long as the claim is clearly raised. *Commonwealth v. White,* 543 Pa. 45, 50, 669 A.2d 896, 899 (1995). Clearly, Hoak has raised a claim under Article I, Section 8 of the Pennsylvania Constitution, as evinced by his citation to that provision and case law interpreting it both in his brief to this Court and in his filings with the suppression court. *See* Brief for Appellant at 10; Omnibus Motion for Pre–Trial Relief, filed May 5, 1995, at 1. I therefore conclude that he has not waived his Pennsylvania constitutional claim by failing to brief *Edmunds*'s four-part test. *See White, supra.*

The first part of the *Edmunds* test requires an analysis of the constitutional provisions that are implicated by the issues presented. *Edmunds, supra,* at 390, 586 A.2d at 895. Article I, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I, § 8. Although the wording of the Article I, Section 8 is similar in language to its federal counterpart, the Fourth Amendment to the United States Constitution, we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical. *E.g., Edmunds, supra.*

The second part of the *Edmunds* analysis requires an examination of the history and application of the Pennsylvania constitutional provision at issue. *Id.* at 390, 586 A.2d at 895. The *Edmunds* court thoroughly examined the history of Article I, Section 8. As noted by the court in *Commonwealth v. Matos,* 543 Pa. 449, 455, 672 A.2d 769, 772 (1996), the history of that provision reveals that the Pennsylvania Supreme Court "has traditionally regarded Article I, Section 8 as providing different, and broader, protections than its federal counterpart." The *Matos* court summarized the history of the provision as follows:

> In *Edmunds,* this Court ... noted that this constitutional provision had its origin *prior* to the Fourth Amendment, in Clause 10 of the original Constitution of 1776. The Court also recognized that the modern version of Article I, Section 8 has remained untouched for over 200 years, and examined this significance:
>
> > [T]he survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.
>
> In *Edmunds,* the Court reviewed the history of Article I, Section 8 to determine whether the "good faith" exception to the exclusionary rule was consistent with the protections afforded by Article I, Section 8. After its review [of this provision], the Court stated:
>
> > The history of Article I, Section 8, thus indicated that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the Fourth Amendment, as articulated by the majority in [*United States v.*] *Leon,* [468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ].
>
> "[A]s this Court has stated repeatedly in interpreting Article I, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." The Court then concluded that the purpose of the exclusionary rule as developed in Pennsylvania was not solely to deter police

conduct, as the United States Supreme Court had interpreted it, but rather was **"unshakably linked to a right of privacy in this Commonwealth."** *Id.* at 455–56, 672 A.2d at 772–73, quoting *Edmunds, supra,* at 394, 397, 586 A.2d at 897, 898 (citations omitted).

The next step in an analysis of the Pennsylvania Constitution is an examination of Pennsylvania case law on the issues before the court. *Edmunds, supra,* at 390, 586 A.2d at 895. As noted above, there are essentially two issues currently before this Court: (1) whether Hoak continued to be seized by the officer immediately following the return of his papers and after the officer advised him that he was free to leave; and (2) whether Hoak's consent to the search of his luggage was effective. I will therefore complete the *Edmunds* analysis separately for each issue.

### A. *Analysis of Seizure Issue*

The Majority reasons that the Fourth Amendment test used to determine whether a person has been seized is the same as the test under Article I, Section 8. Specifically, the Majority cites to *Matos* for the proposition that "Pennsylvania [c]ases have consistently applied [the federal] objective test in determining whether police conduct amounts to a seizure or a mere encounter and are representative of state law pertaining to Article I, Section 8." Maj. op. at 1266. To the contrary, the *Matos* court rejected the Fourth Amendment test as inconsistent with the Pennsylvania Constitution.

In *Matos,* our supreme court held that the Fourth Amendment defines a "seizure" more narrowly than does Article I, Section 8. *Matos,* supra, at 462, 672 A.2d at 776, rejecting *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In *Matos,* the court found that an individual being chased by the police without either probable cause or reasonable suspicion is "seized" under the Pennsylvania Constitution, and in the process rejected the contrary Fourth Amendment rule. *See Matos, supra,* at 462, 672 A.2d at 776.

Specifically, the *Matos* court reasoned that the Fourth Amendment test for a seizure, articulated by the United States Supreme Court in *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 510 (1980), was not the same as the test for seizure under Article I, Section 8. *Matos, supra,* at 457–59, 672 A.2d at 773–74. Under *Mendenhall,* "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Mendenhall, supra,* at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

Our supreme court in *Matos* began its review of Pennsylvania case law by noting that its cases preceding *Mendenhall* set forth a Pennsylvania-based standard for determining whether a person has been seized. *Matos, supra,* at 457, 672 A.2d at 773, citing *Commonwealth v. Barnett,* 484 Pa. 211, 398 A.2d 1019 (1979) and *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973). The court then determined that Pennsylvania courts had consistently followed the Fourth Amendment test since the Court decided *Mendenhall. Id.* at 458, 672 A.2d at 774. The *Matos* court then, however, reasoned that Pennsylvania precursors to *Mendenhall* had developed a test for seizure slightly different from the subsequently announced Fourth Amendment test:

> Both *Jeffries* and *Barnett* exhibit a concern for protecting individuals against coercive police conduct. Moreover, both cases take a *reasonable* and *objective* approach to determining [sic] whether, in fact, the subject being pursued felt free to leave and was therefore seized by the conduct of the police.
>
> Thus, there exists clear precedent in Pennsylvania defining the appropriate standards to be used when considering whether an individual has been seized. The long-standing definition of what constitutes a seizure applied by the Courts of this Commonwealth cannot be ignored, particularly when viewed in tandem with this Court's recognition of the privacy rights embodied in Article I, Section 8.

*Id.* at 459, 672 A.2d at 774 (footnote omitted).

This portion of the Pennsylvania Supreme Court's opinion, when read in context, indi-

cates that the Article I, Section 8 test for seizure employs *Mendenhall*'s objective approach but adds to it an extra consideration of the coercive nature of the police conduct at issue in a particular case. Thus, I believe that, following *Matos*, the proper test for seizure under Article I, Section 8 is whether a reasonable person, considering both the circumstances of the encounter and the coercive nature of the specific police conduct, would not have felt free to leave. *See id.; Barnett, supra,* at 216, 398 A.2d at 1021 (coercive nature of police conduct amounted to seizure); *Jeffries, supra,* at 327, 311 A.2d at 918 (same).

The results in this Court's decisions in *Commonwealth v. Pless,* 451 Pa.Super. 209, 213, 679 A.2d 232, 234 (1996); *Commonwealth v. Parker,* 422 Pa.Super. 393, 401, 619 A.2d 735, 738 (1993); and *Commonwealth v. Lopez,* 415 Pa.Super. 252, 263, 609 A.2d 177, 182 (1992), are consistent with this post-*Matos* Pennsylvania test. In all of these cases, this Court held that any detention of a motorist, without at least reasonable suspicion of criminal activity, that persisted beyond the time necessary to issue a citation for the traffic violation that prompted the initial seizure was unconstitutional. *Pless, supra,* at 213, 679 A.2d at 233 (questioning of motorist following return of license and registration and after motorist was told that she was free to leave constituted unlawful detention); *Parker, supra,* at 401, 619 A.2d at 738–39 (questioning of motorist after determining that a traffic violation occurred constituted a seizure under the Fourth Amendment); *Lopez, supra,* at 263, 609 A.2d at 182 (after determining that no citation was warranted, the police unlawfully detained motorist by asking questions unrelated to the purpose of the initial traffic stop).

I concede that none of these cases specifically consider the coercive nature of questioning by police during a traffic stop. Pennsylvania cases have, however, consistently regarded traffic stops as, at least to some extent, inherently coercive because the motorist is subject to the control of the police officer. *E.g., Com. v. Ellis,* 379 Pa.Super. 337, 355, 549 A.2d 1323, 1331-32 (1988). I believe that an officer's continuing ques-

tions, even following the return of documents and a statement that the motorist is free to leave, would indicate to a reasonable person that he remains subject to the officer's control. As discussed below, this conclusion has considerable support in both case law and scholarly commentary.

Additionally, although *Lopez, Parker,* and *Pless* all relied, at least in part, on a Fourth Amendment analysis, our supreme court has found this fact to be of no consequence:

> We do not find that because these cases were decided to some degree by reliance upon the federal Fourth Amendment that they are not representative of the law of this Commonwealth pertaining to Article I, Section 8. At best, *nothing* can be discerned from the Court's failure to note specifically that Pennsylvania Constitutional rights were also being considered. The federal Constitution provides a *minimum* of rights below which states cannot go. Where our Court, as in *Jeffries,* finds that the police violated the defendant's federal constitutional rights, there is no reason for the Court to go further and address what additional protections the Pennsylvania Constitution might also provide.

*Matos, supra,* at 459 n. 7, 672 A.2d at 769 n. 7 (citation omitted; first emphasis added).

Accordingly, both the history of Article I, Section 8 and Pennsylvania case law indicate that the Pennsylvania Constitution defines "seizure" more broadly than does the Fourth Amendment. This broader definition includes extra consideration of the coercive nature of specific police conduct, an element absent from the federal rule. Compare *Matos, supra,* with *Hodari D., supra.* This part of the *Edmunds* analysis therefore favors the rejection of the Fourth Amendment rule that the Majority proposes, as inconsistent with Article I, Section 8.

The next step in the *Edmunds* analysis is a review of case law from other states on the issue before the court. *Edmunds, supra,* at 390, 586 A.2d at 895. The purpose of this part of the analysis is to determine if any other states have concluded that the federal rule is contrary to their state constitutions. *See Matos, supra,* at 460–61, 672 A.2d at 775.

My research has revealed that three state courts have decided cases with facts indistinguishable from the facts at bar: Following a traffic stop, the police officer issued the motorist a warning or citation, returned the motorist's license and registration, and advised the motorist that she was free to leave; the officer, however, immediately thereafter, and without reasonable suspicion, asked the motorist about the contents of the vehicle, and asked if he could conduct a search, and the motorist consented. *People v. Thomas,* 839 P.2d 1174, 1177 (Colo.1992); *Jones v. State ex rel. Mississippi Dept. of Public Safety,* 607 So.2d 23, 25 (Miss.1991); *State v. Retherford,* 93 Ohio App.3d 586, 639 N.E.2d 498, 501 (1994). The Colorado and Mississippi courts found that no seizure had occurred, while the Ohio court found that the further questioning constituted an unlawful seizure. *Thomas, supra,* at 1177; *Jones, supra,* at 28; *Retherford, supra,* at 507. The Colorado court, however, rested its determination solely upon the United States Constitution, and is therefore not instructive. *Thomas, supra,* at 1177 (defendant's argument based on Fourth Amendment); *see also People v. McKinstrey,* 852 P.2d 467, 469 (Colo.1993)(absent a clear statement to the contrary, Colorado courts presume that a decision is based solely upon federal law). Additionally, the Mississippi court cites only to *Mendenhall* in support of its conclusion, and thus either relies solely upon Fourth Amendment grounds or indicates that the *Mendenhall* test is identical to the test under the Mississippi Constitution. *Jones, supra,* at 28. Moreover, the Mississippi court made its determination in the context of a civil, not criminal, appeal. *Id.* at 24.

The Ohio court in *Retherford,* by contrast, explicitly notes that its decision is based upon both the Fourth Amendment *and* its Ohio counterpart. *Retherford, supra,* at 506. In that case, the suppression court found that a reasonable person in the motorist's position would have felt free to leave. Reversing, the appellate court reasoned:

> We think that it strains credulity to imagine that any citizen, directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel "free to leave" or "at liberty to ignore the police presence and go about his business," in spite of being told otherwise, when she is then asked investigatory questions by the officers and faced with a request to search her vehicle for contraband. We think that no reasonable person subjected to a traffic stop would feel free to walk away at any time when she is questioned about and confronted with the suspicion of drug trafficking. We agree that "statements by officers that individuals are suspected of smuggling drugs" are statements which "intimate that an investigation has focused on a specific individual [which] easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention." Such a belief is only intensified by the inherently coercive nature of the atmosphere created by the initial traffic stop.

> Thus, we conclude that the initial seizure of Retherford was not converted into a mere consensual encounter by her purported release because [the police officer] immediately focused a new investigation on Retherford not reasonably related to the purpose of the initial stop.

*Id.* at 507 (citations omitted). This determination is obviously inconsistent with the Majority's Fourth Amendment conclusion.

Thus, after a review of the only other state court decision on this issue based upon its state's constitution, I conclude that this part of the *Edmunds* test also favors the rejection of the Fourth Amendment rule relied upon by the Majority. *See Matos, supra,* at 461, 672 A.2d at 775.

The final part of the *Edmunds* analysis requires the consideration of "policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds, supra,* at 390, 586 A.2d at 895.

As discussed above, Article I, Section 8 defines seizure by giving extra consideration to the coercive nature of police conduct, consideration that is lacking in the Fourth Amendment test for seizure. Additionally, as discussed above, our courts have consistently viewed traffic stops as inherently coer-

cive because a motorist is subject to the officer's control. The state of modern Pennsylvania jurisprudence therefore strongly inconsistent with the protections embodied in Article I, Section 8.

The Majority cites to *United States v. Werking*, 915 F.2d 1404 (10th Cir.1990), in apparent support of its assertion that only a paranoid person would not feel free to leave despite continued police inquiries. Yet, as Professor LaFave has concluded, the *Werking* court's "conclusion is hard to swallow. Given the fact that Werking quite clearly had been seized when his car was pulled over, the return of the credentials hardly manifests a change in status when it was immediately followed by interrogation concerning other criminal activity." Wayne R. LaFave, 3 *Search and Seizure* § 9.3(a) at 112 (3d ed. 1996). I believe, along with the *Retherford* court and Professor LaFave, that the mere return of a motorist's papers coupled with the officer's statement that the motorist was free to leave would do nothing to dispel a reasonable person's belief that she was still subject to the officer's control when the officer immediately continues to question her regarding unrelated matters. The Majority's assertion that only a paranoid person would not feel free to leave despite the immediate questioning, Maj. op. at 1267, strikes me as being possibly obtuse.

Here, it is undisputed that Hoak was seized when the police ordered him to stop. After the officer issued him the warning for the inoperative taillight, Hoak was presented with, at best, an ambiguous situation: The officer returned Hoak's documents and advised him that he was free to leave, but immediately confronted Hoak with his manifest desire to continue the traffic stop by asking Hoak questions. Under the circumstances, I believe that a reasonable person would continue to feel subject to the officer's control and, thus, not free to drive away. *See Pless, supra; Douglass, supra; Retherford, supra;* LaFave, *supra.* Accordingly, I would hold that Hoak was still seized under Article I, Section 8 of the Pennsylvania Constitution when the officer asked him to answer questions and inquired about the contents of his luggage; this seizure vitiated his

consent to search the duffel bag. *Pless, supra,* at 213, 679 A.2d at 234. I would therefore reverse the judgment of sentence and order that the evidence seized during the search be suppressed.

## B. *Analysis of the Consent Issue*

As stated above, I disagree with the Majority's conclusion and the Commonwealth's argument that the resolution of the seizure issue necessarily disposes of the consent issue. I conclude that even if the Majority is correct in its determination that Hoak was not seized at the time that the officer inquired about the contents of his duffel bag, Hoak's consent nonetheless was ineffective under Article I, Section 8 of the Pennsylvania Constitution.

Hoak argues that his consent was ineffective because he "was not advised that he had the right to refuse ... the request to search the vehicle." Brief for Appellant at 9. The trial court's findings of fact are devoid of any indication that the officer advised Hoak of this right. *See* Findings of Fact and Conclusions of Law, *supra,* at 1–2.

Under Article I, Section 8 of the Pennsylvania Constitution, warrantless searches of automobiles are generally prohibited. *White, supra,* at 55, 669 A.2d at 902, rejecting *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). A warrantless search of property is valid, however, if the subject of the search waives his right to privacy by consenting unequivocally, specifically, and voluntarily to a search of the property. *Commonwealth v. Gibson,* 536 Pa. 123, 132, 638 A.2d 203, 207 (1994). "It is only where there is an intentional relinquishment or abandonment of a known right or privilege that an effective waiver can be found. The subject of a search must be made aware of his rights against a warrantless search for a waiver to be intelligent." *Id.* (citations omitted).

The rule for consent as articulated by our supreme court in *Gibson* seems to be at odds with the Fourth Amendment rule set forth by the United States Supreme Court in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In *Schneckloth,* the Court rejected an argument

that a person's consent to search property is per se ineffective under the Fourth Amendment unless the government can demonstrate that the person consenting knows that he may withhold consent freely and effectively. *Id.* at 221–22, 93 S.Ct. at 2044–45, 36 L.Ed.2d at 859. Instead, the Court held that the voluntariness of a person's consent under the Fourth Amendment "is a question of fact to be determined from all the circumstances" and that the subject's knowledge of the right to refuse consent is not dispositive in the analysis. *Id.* at 248–49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875.

Additionally, the *Schneckloth* Court explicitly denounced the idea that a consent to search should be analyzed as a waiver of Fourth Amendment rights. The waiver analysis, the Court reasoned, was appropriate only in cases where the right relinquished is indispensable to a fair trial, such as the right to counsel. *Id.* at 235–47, 93 S.Ct. at 2051–58, 36 L.Ed.2d at 867–74. "Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." *Id.* at 241, 93 S.Ct. at 2055, 36 L.Ed.2d at 871.

Our supreme court in *Gibson* has clearly retreated from both of these central precepts of *Schneckloth.* First, the *Gibson* court stated that a person must be informed of his rights against a warrantless search for a waiver to be effective. *Gibson, supra,* at 132, 638 A.2d at 207. The court has subsequently held that a person's consent is not effective unless he is informed of the right to refuse consent:

> In this case, [the defendant] was not informed of her right to refuse to accompany police or her right to refuse their entry into her house. Clearly, she waived nothing, and she *certainly* did not freely and voluntarily consent to the police entry into her house.

*Commonwealth v. Melendez,* 544 Pa. 323, 331–32, 676 A.2d 226, 230 (1996) (emphasis in original); *see also Commonwealth v. Guerrero,* 435 Pa.Super. 440, 448, 646 A.2d 585, 588 (1994) (Del Sole, J., concurring) (because

nothing established that the defendant knew of her right to refuse consent, defendant's consent to search her bags did not constitute an intelligent waiver of her rights). Second, our supreme court has clearly embraced the waiver analysis that the *Schneckloth* Court explicitly discarded. Both the *Melendez* and *Gibson* courts indicate that the proper inquiry under Article I, Section 8 is not whether the consent to search was voluntary, but whether the consent to search amounted to a waiver of the subject's right to privacy. *Melendez, supra,* at 331, 676 A.2d at 230 (holding that the defendant "waived nothing"); *Gibson, supra,* at 132, 638 A.2d at 207 (requiring an intelligent and effective waiver of rights); *see also Guerrero, supra,* at 448, 646 A.2d at 588 (Del Sole, J., concurring)(noting the *Gibson* court's requirement of an intelligent waiver). I must therefore conclude that the controlling precedent of our supreme court implicitly rejects the central holdings of the *Schneckloth* Court.

Granted, neither the *Melendez* nor the *Gibson* courts explicitly grounded their decisions in Article I, Section 8 of the Pennsylvania Constitution. Yet, as noted above, our supreme court has stated that this does not mean that the decisions "are not representative of the law of this Commonwealth. At best, nothing can be discerned from the Court's failure to note specifically that Pennsylvania Constitutional rights were also being considered." *Matos, supra,* at 459 n. 7, 672 A.2d at 774 n. 7. Therefore, I am constrained to conclude that the central holdings of *Schneckloth,* as outlined above and as clearly Section 8 of the Pennsylvania Constitution. Because of this conclusion, further analysis under *Edmunds* is obviated, as the *Edmunds* test is designed to determine if this Commonwealth's constitution provides a greater protection of individual rights than does the Constitution of the United States. *See Edmunds, supra,* at 390, 586 A.2d at 895.

I would accordingly hold that for a waiver of this Commonwealth's constitutionally protected guarantee against unreasonable searches to be effective, the Commonwealth must demonstrate that the subject of the search knows of his right to refuse consent to search. *Melendez, supra,* at 331–32, 676

A.2d at 230; *Gibson, supra,* at 132, 638 A.2d at 207; *see also, Guerrero, supra,* at 448, 646 A.2d at 588 (Del Sole, J., concurring). Here, the suppression court's factual findings fail to show that the Commonwealth demonstrated at the suppression proceeding that Hoak was aware of his right to refuse the officer's request to search his luggage. Accordingly, I would hold that the suppression court's determination that Hoak's constitutional rights were not violated was in error, and that the fruits of the search must therefore be suppressed. *See Melendez, supra; Gibson, supra.*

### III. *CONCLUSION*

Based on the foregoing, I would remand this matter to the suppression court for the limited determination of whether a suppression hearing was held and, if so, whether a record was made of the evidence presented at that hearing. Furthermore, I would retain this panel's jurisdiction over Hoak's appeal pending this determination.

Assuming that an adequate record exists for appellate review, I would hold that Hoak was seized under Article I, Section 8 at the time that the officer inquired about the contents of his luggage and, regardless of whether he was seized at that time, that his consent to search his duffel bag was ineffective under the Pennsylvania Constitution. I would therefore reverse the judgment of sentence and order the suppression of the evidence seized during that search.

**FORD ELLIOTT, Judge, concurring and dissenting.**

Initially, I agree with the dissent that the record is inadequate at this time to review and support any analysis on the merits of the issue presented. Having said so, I, like my colleagues, will address the merits.

As to the result reached by the majority, I concur in that result only. I believe the dissent's analysis that the stop was a continuing seizure in the form of an investigatory detention is the correct analysis under the constitutional law of this Commonwealth as interpreted by our supreme court. However, on the facts of this case, I believe the trial court's finding that the police officer had information from a confidential informant that appellant might be involved in the trafficking of drugs is enough reasonable suspicion for at least continued questioning of appellant. Therefore, the officer was justified in asking what was in the bags, and appellant was *not* free to leave. Whether this information would have been sufficient to support a warrant was no longer relevant after appellant agreed to allow the officer to search his bag. However, having stated this, I agree with the dissent's analysis regarding the so-called "first-tell-then-ask" rule. I do so based on the Pennsylvania constitutional analysis presented by the dissent, but also based on a fair balancing of the interests of the police in discovering criminal activity, and the interests of innocent travelers in their privacy. As set forth by Justice Ginsberg in concurrence in *Ohio v. Robinette,* —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996):

> From their unique vantage point, Ohio's courts observed that traffic stops in the State were regularly giving way to contraband searches, characterized as consensual, even when officers had no reason to suspect illegal activity. One Ohio appellate court noted: '[H]undreds, and perhaps thousands of Ohio citizens are being routinely delayed in their travels and asked to relinquish to uniformed police officers their right to privacy in their automobiles and luggage, sometimes for no better reason than to provide an officer the opportunity to "practice" his drug interdiction technique.' 93 Ohio App.3d, at 594, 639 N.E.2d, at 503 (footnote omitted).

> . . . .

> The first-tell-then-ask rule seems to be a prophylactic measure not so much extracted from the text of any constitutional provision as crafted by the Ohio Supreme Court to reduce the number of violations of textually guaranteed rights. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), this Court announced a similarly motivated rule as a minimal national requirement without suggesting that the text of the Federal Constitution required the precise measures the Court's opinion set forth. See *id.,* at 467 [86 S.Ct.

at 1624] ('[T]he Constitution [does not] necessarily requir[e] adherence to any particular solution' to the problems associated with custodial interrogations.); see also *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285 [1291–92], 84 L.Ed.2d 222 (1985) ('The Miranda exclusionary rule ... sweeps more broadly than the Fifth Amendment itself.'). Although all parts of the United States fall within this Court's domain, the Ohio Supreme Court is not similarly situated. That court can declare prophylactic rules governing the conduct of officials in Ohio, but it cannot command the police forces of sister States. The very ease with which the Court today disposes of the federal leg of the Ohio Supreme Court's decision strengthens my impression that the Ohio Supreme Court saw its rule as a measure made for Ohio, designed to reinforce in that State the right of the people to be secure against unreasonable searches and seizures.

*Id.* at ——, ——, 117 S.Ct. at 422, 423.

By the same analysis, it is within our province to effectuate such a rule for Pennsylvania, and such a rule serves to accommodate the competing and important interests cited above. This court should issue a clear-cut instruction to police officers that they must first inform the motorist that he or she is free to go before the officers engage in a consensual search of a vehicle or its contents at the conclusion of a traffic stop when the officers have no other reasonable or articulable suspicion of criminal activity.

Hence, while I agree with the dissent's constitutional analysis, I disagree that under the facts of this case, the continued detention was unlawful, thereby rendering the consensual search invalid. As a result, I would affirm the judgment of sentence.

SCHILLER, Judge, concurring.

I concur in the result. Because it is appellant's burden to present an adequate record for appellate review,[1] and because the record submitted to this Court is clearly deficient,[2]

we are powerless to grant appellant relief. Thus there is no basis upon which we can reverse the judgment of sentence entered by the Court of Common Pleas of Mercer County.

---

1. *Commonwealth v. Chopak*, 532 Pa. 227, 236 n. 5, 615 A.2d 696, 701, n. 5 (1992); *Commonwealth v. Williams*, 357 Pa.Super. 462, 466, 516 A.2d 352, 354 (1986); Pa.R.A.P.1911(a); (d).

2. See Dissenting Opinion, Johnson, J.