**Fayne DeAngelo PADILLA, and Christy Lee Padilla, his wife, Individually and as Parents and Natural Guardians of Elijah DeAngelo Padilla and Elisa Lee Padila, Plaintiffs,**

v.

**Gregory MILLER, a Pennsylvania State Trooper, Defendant.**

No. 3:97–CV–0873.

United States District Court, M.D. Pennsylvania.

Nov. 17, 1999.

James A. Swetz, Cramer, Swetz & Mc-Manus, Stroudsburg, PA, for plaintiffs.

John G. Knorr, III, Michael L. Harvey, Amy Zapp, Office of Attorney General, Harrisburg, PA, Linda Cadden Barrett, PA Department of Education, Office of Chief Counsel, Harrisburg, PA, for defendant.

## MEMORANDUM

VANASKIE, Chief Judge.

This action under 42 U.S.C. § 1983 concerns the constitutionality of a Pennsylvania State Trooper's conduct (a) in searching plaintiff Fayne DeAngelo Padilla during a traffic stop; (b) in questioning Fayne Padilla and his wife, Christy, following the completion of the traffic stop; and (c) in searching their automobile, its compartments and their luggage contained therein. Having carefully considered the testimony and other evidence presented during a non-jury trial in this matter, and after thoroughly examining the applicable case law, I am constrained to conclude that Trooper Gregory Miller violated the constitutional rights of Padilla, his wife, Christy Lee Padilla, and their minor children, Elijah and Elisa Padilla. I also find that the applicable constitutional principles were clearly established when Trooper Miller unreasonably detained and unlawfully searched the Padilla vehicle and that a reasonable officer would not have believed the conduct in question to have been reasonable. Accordingly, the Padillas are entitled to an award of damages. Plaintiffs, however, have not established actual injury as a result of the constitutional violations and have not shown that an award of punitive damages is appropriate under the circumstances of this case. Accordingly, relief will be limited to an award of nominal damages.

## I. PROCEDURAL BACKGROUND

This civil rights action, brought on June 10, 1997, followed a criminal prosecution against Fayne DeAngelo Padilla in the Court of Common Pleas of Monroe County based upon evidence seized from the Padilla vehicle on January 13, 1996. The search of the vehicle and the seizure of incriminating evidence followed a traffic stop on Interstate 80 in Monroe County, Pennsylvania. The Court of Common Pleas of Monroe County held that the detention of the Padillas and ensuing search of their vehicle on January 13, 1996 were unlawful and suppressed the evidence seized by the State Police and the incriminatory statements of Padilla elicited by the State Police. The suppression of the evidence resulted in Fayne Padilla's release from confinement after having been imprisoned more than 60 days.

The Complaint in this action, brought by the Padillas on their own behalf and on behalf of their minor children who were passengers in the vehicle at the time of the stop and arrest, asserted claims of unlawful seizure, detention and search, violation

of *Miranda* and Fifth Amendment rights, and denial of equal protection and right to interstate travel. Named as defendants were Trooper Gregory Miller and "unidentified supervisory personnel" of the Pennsylvania State Police. Prior to trial, the parties stipulated to the dismissal of the unidentified defendants and all claims other than the Fourth Amendment claims set forth in Count I of the Complaint. (*See* Dkt. Entry 31.)

A non-jury trial was conducted on April 12, 1999. At trial, plaintiffs contended that the state court findings on the suppression ruling are binding on Miller and require a finding of liability. Alternatively, plaintiffs argued that the evidence independently establishes liability. Miller, in addition to arguing that the state trial court finding is not binding in the civil rights action and that he did not violate plaintiffs' Constitutional rights, argued that, in any event, he is entitled to qualified immunity. The parties have filed designated facts not in dispute and post-trial briefs. This matter is now ripe for disposition.

## II. *FACTUAL BACKGROUND*

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I make the following findings of fact.

### A. The Parties

1. Trooper Gregory Miller was employed as a Pennsylvania State Police Officer on January 13, 1996. (Dkt. Entry 40, Defendant's Designation of Disputed and Undisputed Findings to Plaintiff's Original Findings of Fact and Conclusions of Law (D's Stmt of Facts) at 1.) [1]

2. Fayne DeAngelo Padilla is a resident of Springfield, Missouri who was born November 5, 1970. (April 12, 1999 Trial Transcript (Tr.), Dkt. Entry 42, at 22.)

3. Christy Padilla (formerly Christy Settles) is a resident of Springfield, Missouri. She was nineteen (19) years old and eight and a half months pregnant at the time of the incident in question. (Tr. at 94, 179.)

4. Elijah Padilla and Elisa Padilla are the minor children of Fayne and Christy Padilla who were in their company on January 13, 1996. (Tr. at 23–24, 94.)

### B. The Traffic Stop

5. On January 13, 1996, Miller was conducting a stationary patrol in a marked car on Interstate 80 in Monroe County, Pennsylvania. (D's Stmt of Facts at 1.)

6. Trooper Miller was accompanied by a dog trained to detect controlled substances. (*Id.*) He was dressed in a uniform distinctive to state troopers in charge of canine units.

7. At approximately 2:30 p.m., Trooper Miller stopped a vehicle bearing Missouri license plates for allegedly speeding and switching lanes without a turn signal. (*Id.*; Tr. at 175–76.) He directed the vehicle, operated by Fayne Padilla, to pull over at a rest stop on I–80.

8. Trooper Miller got out of his patrol car and approached the stopped vehicle on the passenger side and requested that the driver produce his license and registration. (D's Stmt of Facts at 2.)

9. The driver of the car produced a valid Missouri driver's license in the name of Fayne D. Padilla and a Missouri identification card in the name of Fayne DeAngelo Padilla. (*Id.*)

---

**1.** As intimated above, each side indicated which findings of fact proposed by the other side were disputed or not. Unless otherwise indicated, citation to a party's designation of disputed and undisputed findings signifies that the fact is not contested.

10. The passenger, plaintiff Christy Padilla, identified herself as Christy L. Settles, of Springfield, Missouri.[2] (*Id.*)

11. Christy Padilla identified herself as the owner of the car and provided Trooper Miller with evidence of ownership. (*Id.*)

12. Christy and Fayne Padilla's two minor children, Elijah DeAngelo Padilla and Elisa Lee Padilla, were also passengers in the car. (*Id.*)

13. Trooper Miller advised Fayne Padilla of the reasons for the traffic stop and returned to the patrol car to write a warning for the violations and conduct a radio check of the license for the driver of the car. (*Id.*; Plaintiff's Response to Defendant Miller's Proposed Findings of Fact and Conclusions of Law (Plf's Stmt of Facts), Dkt. Entry 39, at 2; Tr. at 171.)

14. While writing the warning, Miller ran a National Crime Information Center (NCIC) check on Fayne Padilla. (Plf's Stmt of Facts at 2; Tr. at 171.)

15. Miller's NCIC check registered a hit, showing that Fayne DeAngelo Padilla, who was born November 5, 1970 and was identifiable by a scar on his chest, had been arrested for theft charges in Springfield, Missouri, including charges for the possession, manufacture and sale of illegal weapons. (Tr. at 171–72.) The NCIC check also indicated that Padilla had used as an alias the name of Paul Christopher Brown and a birth date of March 5, 1970. Under this alias, Padilla had been arrested for grand theft auto and possession, manufacture and sale of dangerous weapons. (Tr. at 172.)

16. Miller did not obtain any information that Padilla or someone matching his description was wanted in another jurisdiction or was a fugitive from justice. (Tr. at 172.)

17. After obtaining this information, Miller re-approached the car and asked Padilla to exit the car and Padilla complied. (D's Stmt of Facts at 2.) Padilla was instructed to move to the back of his vehicle, which was located in front of Miller's police car. (Tr. at 29, 173.)

18. Trooper Miller requested that Fayne Padilla lift his shirt in order to see if he could locate a scar on Padilla's chest. Miller did not tell Padilla why he wanted to examine Padilla's chest. (Tr. at 173.)

19. Miller could not find the scar and told Fayne Padilla to return to the car. (D's Stmnt. of Facts at 2.)

20. After making another radio inquiry, Miller once again approached the Padilla car from the driver's side and asked Padilla to step from the car and lift his shirt, explaining that he was looking for a scar so as to positively identify Padilla. Padilla complied. (*Id.*; Tr. at 174.) This occurred again between the state police cruiser and the Padilla vehicle (*Id.*)

21. Miller went back to the state police car and proceeded to write Padilla a traffic warning. (Tr. at 175.)

### C. The Detention of the Plaintiffs

22. Before Miller finished writing the warning, two other State Police Troopers, Powell and Semler, arrived in separate cars and parked behind Miller's car. Powell arrived before Semler. Semler arrived at approximately 3:00 p.m., about 30 minutes after Miller had stopped the Padilla vehicle (Tr. at 133–34, 144–45.)

23. When Semler arrived, Trooper Powell was standing with Padilla between the Padilla car and Miller's cruiser. Trooper

---

**2.** Ms. Settles married Mr. Padilla after the incident in question. (Tr. 23.) For the purposes of this opinion she will be referred to as Christy Padilla.

Miller was still in his car, writing a warning to Padilla. (Tr. at 134, 158.)

24. Trooper Miller exited his car and gave the written warning to Padilla in the presence of Troopers Powell and Semler. (Tr. at 158.) Trooper Miller explained the contents of the warning to Padilla, who signed for his copy. (D.'s Stmt of Facts at 2.)

25. Trooper Miller then gave Padilla a copy of the warning and told Padilla he was free to leave. (*Id.*)

26. Before Padilla could get back in his car, Trooper Miller called to Padilla and said he wanted to ask Padilla some more questions. (Tr. at 34.) Miller instructed Padilla to return to the back of the car; Padilla complied. (*Id.*) At this time, Troopers Powell and Semler were still on the scene, standing near Trooper Miller's car (Tr. at 158.)

27. Trooper Miller interrupted Padilla's departure to ask him some questions because he suspected that Padilla was engaged in some criminal activity. (Tr. at 177.) However, Trooper Miller had not observed any evidence of criminal activity and was satisfied that Padilla was not wanted in another jurisdiction. (Tr. at 217–18.) Trooper Miller's tone was authoritative, indicating to Padilla that Miller was not finished with him and that Padilla was not free to leave. (Tr. at 36, 40, 73.)

28. Miller asked Padilla about the origin, destination and duration of his trip. (D's Stmt of Facts at 2.) Padilla replied that he was driving from Springfield, Missouri to Long Island, New York to borrow $350 for rent from his aunt. Padilla stated that as soon as he obtained the money, they would return to Springfield. (Tr. at 178.)

29. While Fayne Padilla remained at the rear of the vehicle in the company of Troopers Powell and Semler, Miller approached the passenger side of the vehicle and asked Christy Padilla about the origin, destination and duration of the trip. She stated that they were going to the home of Padilla's aunt on Long Island and were to stay there until she had her baby. (Tr. at 179.)

30. Miller then returned to the rear of the car to ask Fayne Padilla a few more questions. (*Id.* at 179–180.)

## D. The Search of the Vehicle

31. After asking Fayne Padilla more questions, Trooper Miller asked Christy Padilla, the owner of the car, if she would mind if he looked in the car. (Tr. at 236.) She said that she would not mind. (Tr. at 180.)

32. Trooper Miller never told Christy Padilla the purpose of the search, what he was looking for, or that he intended to search all vehicle compartments, including the trunk, and all containers in the car, such as luggage. (Tr. at 236–37.)

33. Trooper Miller searched under the driver's seat, and then searched under the passenger seat while Christy Padilla remained in the car. (Tr. at 180.) He removed from the front of the car a tote bag and Christy Padilla's purse, placing them on the top of the car. (*Id.*) After Christy Padilla consented to the search, Trooper Miller asked her if there was a trunk release in the passenger compartment of the car. She told him that there was, and Trooper Miller reached into the glove compartment and pushed a button that released the trunk. (Tr. at 122, 180; D's Stmt of Facts at 3.)

34. Trooper Miller then proceeded to search the trunk. In the trunk, he saw a nylon gym bag. He opened the gym bag and observed that it contained men's clothing. Fayne Padilla was still standing at the rear of the vehicle as Trooper Miller began to examine the contents of the gym

bag. Trooper Miller did not ask Fayne Padilla for his consent to search the gym bag. (Tr. at 242–46.)

35. As Trooper Miller was examining the contents of Fayne Padilla's gym bag, Fayne Padilla informed Trooper Miller that Padilla was involved in some "despicable stuff," to which Miller responded by asking whether Fayne Padilla was a "snitch." (Transcript of State Court Habeas Corpus Proceedings (PX–5) at 14.) Fayne Padilla answered this inquiry in the affirmative. (*Id.;* Tr. at 181.)

36. Trooper Miller found in the gym bag a Glock 9 mm and a 380 semi-automatic pistol. He also found 50 rounds of 40 caliber ammunition and 31 rounds of 9 mm ammunition. (Tr. at 183.)

### E. The Arrest of Fayne Padilla

37. Trooper Miller directed Fayne Padilla to remain at the rear of the vehicle while he returned to his patrol car to run a check on the guns found in Padilla's bag. (D's Stmt of Fact at 3; Tr. at 39–40, 184.) Upon learning that the weapons had been reported stolen, he arrested Fayne Padilla and placed him in handcuffs. (D's Stmt of Facts at 3; Tr. at 39–40; 184.)

38. Miller then asked him if there was anything else illegal in the car. Padilla told him that there was a small amount of marijuana in Christy Padilla's purse. Trooper Miller, without asking Christy Padilla for consent to search her purse, opened the purse and, after a brief search, found a small amount of marijuana. (Tr. at 40–42, 104–106, 184.)

39. Trooper Miller informed Christy Padilla that her husband was under arrest and would be taken to the State Police Barracks in Swiftwater, Pennsylvania. (Tr. at 185.)

40. Christy Padilla was not placed under arrest and was not handcuffed. (D's Stmt Of Facts at 3.)

41. Fayne Padilla was placed in Trooper Powell's state police car and taken to the Swiftwater, Pennsylvania State Police Barracks for processing. (Tr. at 186.)

42. Christy Padilla followed in her car with her two minor children. (D's Stmt Of Facts at 3.)

43. The roadside encounter took approximately one hour from the time of the stop (about 2:30 p.m.) until Troopers Miller, Powell and Semler left the scene with the Padillas (about 3:30 p.m.).

44. It was not until about 8:30 p.m., about five hours after Fayne Padilla was arrested, that Trooper Miller explained to Padilla the *Miranda* warnings. (Tr. at 250; DX–1.)

45. After acknowledging that he understood his *Miranda* rights, Fayne Padilla signed a written statement implicating himself in a narcotics trafficking conspiracy and admitting that the weapons and marijuana found in the search were in his possession. (DX–2)

46. Trooper Miller filed the following criminal charges against Fayne Padilla: receiving stolen property, possession of firearms not to be carried without a license, and possession of a controlled substance. (D's Stmt of Facts at 3–4.)

### F. Subsequent Events

47. After being instructed by Trooper Miller that it was time to go, Christy Padilla left the Swiftwater barracks. She stayed in a nearby hotel that night and proceeded to drive back to Springfield, Missouri, the next day, January 14, 1996. (Tr. at 114, 125; DX–5.)

48. Fayne Padilla was incarcerated in the Monroe County Correctional Facility as a result of his inability to make bail. (Tr. at

46.) He was placed on a suicide watch for his first four days of confinement. (Tr. at 48.)

49. Fayne Padilla, represented by Attorney William Sayer, filed in the Court of Common Pleas of Monroe County a petition for a writ of habeas corpus, seeking suppression of the evidence gathered and statements made at the scene of the traffic stop on January 13, 1996. (Tr. at 9–15; D's Stmt of Facts at 5; PX–5.)

50. An evidentiary hearing was conducted by the Honorable Jerome P. Cheslock on the habeas corpus petition on March 19, 1996. (PX–5.)

51. The only person to testify at the habeas corpus hearing was Trooper Miller. (Tr. at 16.)

52. In an Opinion and Order dated April 2, 1996, Judge Cheslock granted the petition for a writ of habeas corpus and suppressed all evidence seized as a result of the search conducted on January 13, 1996, as well as any statements made by Fayne Padilla after the search. (PX–4.)

53. As a consequence of the suppression ruling, Judge Cheslock ordered that Fayne Padilla's bail be reduced to release on recognizance status, and Fayne Padilla was released from confinement on April 4, 1996. (Tr. at 13, 48–49; PX–6.)

54. Upon release from confinement, Fayne Padilla returned to Springfield, Missouri by bus. (Tr. at 49.)

55. The Monroe County District Attorney's office appealed the Order granting the petition for writ of habeas corpus. (D's Stmt of Facts 4.)

56. The appeal was later withdrawn by the Monroe County District Attorney's office. (Id.)

57. When Trooper Miller voiced his opposition to the District Attorney's decision to withdraw the appeal of Judge Cheslock's decision, he was told that it was not his decision to make. (Tr. at 205–06.) Trooper Miller did not sign any of the pleadings and was not a named party to the appeal of Judge Cheslock's decision, which was filed by the Monroe County District Attorney's Office. (Tr. 19–20.)

## III. DISCUSSION

### A. Collateral Estoppel

The Padillas claim that Judge Cheslock's decision granting Fayne Padilla's petition for a writ of habeas corpus precludes Trooper Miller from re-litigating the question of whether he had violated Fayne Padilla's Fourth Amendment rights. (P's Brief in Support of Proposed Findings of Fact and Conclusions of Law (P's Br.), Dkt. Entry 46, at 7.) More specifically, plaintiffs assert that Trooper Miller should be estopped from contesting the following:

a. That [Fayne Padilla] was seized by Miller and that the events following Miller telling Padilla he was free to go was not a consensual encounter; and

b. That a reasonable person in Fayne Padilla's position would have felt constrained by state authority and that he was not free to go; and

c. That Miller's detention of Fayne Padilla was not supported by any particularized suspicion. [Id.]

The doctrine of collateral estoppel may be invoked where: (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action. *Temple Univ. v. White*, 941 F.2d

201, 212 (3d Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992)(citing *Gregory v. Chehi,* 843 F.2d 111, 121 (3d Cir.1988)). Trooper Miller contends that the issues in the state proceedings were not the same as those before this Court, that he was not in privity with the Commonwealth and that he did not have a full and fair opportunity to litigate the matters raised in the state court proceedings.

In *Smith v. Holtz,* 30 F.Supp.2d 468, 474 (M.D.Pa.1998), Judge McClure addressed the issue of whether a federal district court, hearing a § 1983 claim, is bound by the holding of a state court in an underlying or related state criminal proceeding. Judge McClure, after noting a lack of Third Circuit guidance on the issue, relied on, *inter alia, Duncan v. Clements,* 744 F.2d 48 (8th Cir.1984), to support his holding that the elements for application of the doctrine of offensive collateral estoppel were not satisfied. *Smith,* 30 F.Supp.2d at 474–77. In *Duncan,* the Eighth Circuit held that the doctrine of offensive collateral estoppel was not applicable to the federal court proceedings because the police officer was not a party in the underlying state criminal action. *Duncan,* 744 F.2d at 52–53.

The Tenth Circuit, applying Oklahoma law, has reached an identical conclusion. *See Kinslow v. Ratzlaff,* 158 F.3d 1104 (10th Cir.1998). In *Kinslow,* a state court had dismissed criminal charges brought against the plaintiff. As in this case, the dismissal of the criminal prosecution was followed by a civil rights action charging, *inter alia,* unlawful search and seizure. As in this case, the plaintiff argued that the police officers were precluded from contesting the legality of the search and seizure of a vehicle based upon the state court ruling. In holding that the elements of issue preclusion were not satisfied, the court explained:

> In order for issue preclusion to apply to this case, Defendants, Officers Ratzlaff and Serrate, who are the arresting officers in Plaintiff's criminal proceeding, must have been parties to that criminal proceeding or in privity with the parties in that action. Clearly, the officers were not parties to Plaintiff's criminal proceeding. Plaintiff's opponent was the State of Oklahoma. Officers Ratzlaff and Serrate had no control over the prosecution of the criminal case and their role 'at the [preliminary] hearing was simply that of a witness for the prosecution.' The officers 'could not call witnesses, ... direct the examination of the State's witnesses, ... [or] choose the counsel who represented the State at the suppression hearing. Nor could the officers appeal the ruling once it was made.'
>
> Although Oklahoma courts have not addressed the precise problem that confronts us, we also believe that, under Oklahoma's definition of privity, the officers were not in privity with the State of Oklahoma. The officers are being sued in their individual capacity in this action and their personal interests, which were not at stake in the criminal proceeding, differ from Oklahoma's interests. 'The mere fact that [the officers] happen[ed] to be interested in a particular question, or in proving a state of facts as may have been presented in [the prior action,] ... does not establish that they were in privity with any of the parties in that action.' Because the officers were neither parties nor privies to the prior state court determination and, therefore, did not have a full and fair opportunity to litigate in state court the constitutionality of the issues in this section 1983 action, the doctrine of issue preclusion does not apply to this case.

*Id.* at 1106–07 (footnotes and citations omitted). Other courts have reached identical conclusions, finding that a ruling suppressing evidence or dismissing a criminal prosecution is not binding on police officers later sued in a § 1983 action. *See, e.g., Tierney v. Davidson*, 133 F.3d 189, 195 (2d Cir.1998); *Jackson v. Ramundo*, No. 95 CIV. 5832, 1997 WL 678167, *4 (S.D.N.Y., Oct.30, 1997); *Caruthers v. Matos*, No. 96 C 4303, 1997 WL 208445, *5 (N.D.Ill., Apr.21, 1997); *Trujillo v. Simer*, 934 F.Supp. 1217, 1224 (D.Colo.1996).

It is clear that Trooper Miller was not a party to the criminal prosecution. Plaintiffs contend that Trooper Miller should be deemed "in privity" with the Commonwealth of Pennsylvania, which was a party to the criminal prosecution. Plaintiffs, however, cite no authority that supports this proposition. As noted above, a number of courts have concluded that police officers are not in privity with the state for purposes of offensive collateral estoppel.

■ "Privity is a legal determination for the trial court as to whether the relationship between the parties is sufficiently close to support [issue] preclusion." *Phillips v. Kidder, Peabody & Co.*, 750 F.Supp. 603, 607 (S.D.N.Y.1990). Privity has been recognized in circumstances where the non-party shared a concurrent right to the party's interest, where the non-party controlled the prior litigation, and where the party adequately represented the non-partys' interests in the prior proceedings. *First Options of Chicago, Inc. v. Kaplan*, 913 F.Supp. 377, 383–84 (E.D.Pa.1996). None of these circumstances pertains here. Trooper Miller did not have control over the prosecutor and did not make decisions with regard to the prosecution or whether the appeal from the adverse suppression ruling should be pursued. At the habeas corpus hearing, Assistant District Attorney Curtis Rogers represented the state's interest, not Trooper Miller's. Trooper Miller did not have a personal stake in the outcome of Padilla's criminal proceeding. *See Smith*, 30 F.Supp.2d at 475 (state law enforcement officer does not have a personal stake in the outcome of the prosecution). In sum, there is not the identity of interests between that of the Commonwealth in the prosecution of Fayne Padilla and that of Trooper Miller in this civil rights action to support the legal determination that Trooper Miller was in privity with the Commonwealth.

■ Furthermore, it would be unfair to Trooper Miller to apply offensive collateral estoppel here. As noted above, he did not control the decisions in the state court prosecution. As recognized in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), "[t]he general rule should be that in cases where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." To hold that Trooper Miller is precluded from litigating the facts in the instant case based upon a proceeding controlled by an Assistant District Attorney, who represented the interests of the Commonwealth and not those of Trooper Miller, would be manifestly unfair. Accordingly, the doctrine of collateral estoppel will not be applied in this case.

**B. Did Trooper Miller Violate Plaintiffs' Fourth Amendment Rights?**

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." For purposes of this litigation, plaintiffs' Fourth Amendment claims can be divided into the following stages: (1) the initial stop of the Padilla vehicle and the interaction between Fayne Padilla and Trooper Miller prior to the point in time

when Trooper Miller informed Fayne Padilla that he was "free to go"; (2) the encounter between Fayne Padilla and Trooper Miller after Trooper Miller informed him that he was "free to go"; (3) the search of the vehicle and its contents; and (4) the search of Christy Padilla's purse.

■ With respect to the first stage, Trooper Miller clearly effected a seizure of the vehicle and its occupants when he directed Fayne Padilla to pull over in the rest area on Interstate 80. *See Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' . . . ."). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810, 116 S.Ct. 1769. In this case, the Padillas do not contest the existence of probable cause to stop the vehicle. Trooper Miller testified that he had reason to believe the vehicle was speeding and had made two illegal lane changes. Accordingly, the initial stop of the Padilla vehicle did not abridge Fourth Amendment rights.

■ Once the vehicle was stopped, Trooper Miller had the right to order the occupants to exit the vehicle. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). And, of course, Officer Miller could ask for production of a driver's license and registration documents, as well as question Fayne Padilla on matters reasonably related in scope to the justification for the stop of the vehicle. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). (Analogizing a traffic stop to a so-called

"*Terry* stop," (named after *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), during which a police officer, lacking probable cause to make an arrest but having a reasonable basis to suspect an individual, may briefly detain that person in order to conduct an inquiry "reasonably related in scope to the justification for [the stop]." *Id.* at 29, 88 S.Ct. 1868.) Furthermore, a police officer may undertake a pat down search of the driver of a stopped vehicle "where the officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *United States v. Moorefield,* 111 F.3d 10, 13 (3d Cir.1997) (*quoting Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

■ In this case, Trooper Miller acted well within his authority in obtaining Fayne Padilla's driver's license and vehicle registration information. He also acted well within his authority in ordering Fayne Padilla to exit the vehicle. But, he did not have a proper basis for asking Padilla on at least two occasions to lift his shirt so that Trooper Miller could find a scar on Padilla's chest. Trooper Miller had already learned that a person with the same name and date of birth as listed on Fayne Padilla's driver's license had a criminal record. Thus, Padilla's identity was not in issue. If Fayne Padilla had been using a name that was suspected to be an alias, then confirmation of identity may have been reasonable. If Trooper Miller had obtained information by way of his computer check that a person matching Padilla's description and bearing a scar on his chest was a wanted individual, then the examination may have been reasonable. But Trooper Miller had not obtained such information. Under these circumstances, requiring Padilla on at least two occasions on a cold January day to lift his shirt so that Trooper Miller could inspect Padilla's

chest for the existence of a scar exceeded the permissible bounds for the traffic stop. Stated otherwise, Trooper Miller has not pointed to specific and articulable facts which, taken together with rationale inferences from those facts, reasonably warranted the intrusion. This conclusion is buttressed by the "significantly heightened protection afforded against searches of one's person." *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 1302, 143 L.Ed.2d 408 (1999).[3] Accordingly, I find that Fayne Padilla's Fourth Amendment rights were violated by Trooper Miller during the first stage of the traffic stop.

■ The second stage of the traffic stop occurred after Trooper Miller informed Fayne Padilla that he was free to leave. Before Fayne Padilla was able to re-enter his vehicle, however, Trooper Miller told Padilla that he was "not through with him yet," wanted to ask him some more questions, and instructed Padilla to return to the rear of the vehicle.

Trooper Miller contends that he converted the seizure attendant to the stop of the Padilla vehicle into a "consensual encounter" by informing Padilla he was free to leave. Trooper Miller argues, alternatively, that he had a proper basis for continuing to detain Fayne Padilla to ask him more questions.

■ When an encounter with a law enforcement officer is consensual, the law enforcement officer's interrogation need not be supported by reasonable suspicion. *See United States v. Kim,* 27 F.3d 947, 950 (3d Cir.1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). The test for determining whether an en-

counter is consensual is "whether a reasonable person would feel free 'to disregard the police and go about his business,' or ultimately 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter,' 'taking into account all of the circumstances surrounding the encounter.' " *Id.* at 951 (quoting *Florida v. Bostick,* 501 U.S. 429, 434, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

In *Florida v. Bostick,* the Court addressed the issue of when police questioning constitutes a seizure under the Fourth Amendment. The Court held that the crucial test is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." 501 U.S. at 436–37, 111 S.Ct. 2382. The Court further explained that "no seizure occurs when the police ask questions of an individual, ask to examine the individual's identification, and ask consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437, 111 S.Ct. 2382. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446

---

**3.** The fact that Fayne Padilla consented to allow Trooper Miller to examine his chest does not alter this conclusion. First, the request was not reasonably related in scope to the justification for the traffic stop. Second, Trooper Miller made his request while in pos-

session of Padilla's driver's license and vehicle registration documents. Thus, Padilla was not in a position where he could refuse Trooper Miller's request and terminate the encounter.

U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

■ In the instant case, in view of all the circumstances surrounding the encounter, a reasonable person would not have felt free to decline Trooper Miller's request or otherwise terminate the encounter. On a cold January day, Trooper Miller had ordered Fayne Padilla out of the car, dressed only in a shirt, at least two times, clearly establishing that Trooper Miller was in control of the encounter. (Tr. at 30–33.) Trooper Miller had also ordered Padilla to lift his shirt so he could search for an identifying scar. (*Id.*) After issuing Padilla a warning, Trooper Miller confronted Padilla before Padilla had a chance to re-enter his car and, in an authoritative voice, told Padilla he wanted to ask him a few questions. (*Id.*) Present with Trooper Miller were two other state police officers. Trooper Miller's communication to Padilla was thus supported by a show of force. The circumstances would indicate to a reasonable person that, contrary to Trooper Miller's statement that "you are free to go," Padilla had no real choice but to remain at the scene and answer Trooper Miler's inquiries. Under the circumstances, a reasonable person would have felt that compliance with Trooper Miller's request was required. *See United States v. Buchanon,* 72 F.3d 1217, 1224–25 (6th Cir.1995) (finding that reasonable person confronted by four police officers and a police dog would not have felt free to terminate the encounter). Accordingly, I find that Padilla was seized for purposes of the Fourth Amendment.[4]

■ Once a police officer has completed the purposes of a traffic stop and does not have a reasonable and articulable suspicion of criminal activity, continuing the detention of the vehicle occupants violates their Fourth Amendment rights. *See United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995); *United States v. Ramos,* 42 F.3d 1160, 1164 (8th Cir.1994), *cert. denied,* 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995); *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir. 1988), *overruled on other grounds, United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.1995). Thus, unless Trooper Miller had a reasonable and articulable suspicion to continue the detention of Fayne Padilla and the other occupants of the Padilla vehicle, he violated their Fourth Amendment rights by not allowing them to leave

---

4. The Pennsylvania Superior Court addressed a similar situation in *Commonwealth v. Hoak,* 700 A.2d 1263 (Pa.Super.1997), *aff'd by evenly divided court,* 557 Pa. 496, 734 A.2d 1275 (1999). In *Hoak,* the Court held that Hoak was not seized under the Fourth Amendment when he responded to questions from an officer after the officer had given Hoak a traffic warning and then told him that he was free to leave. 700 A.2d at 1265–68. The court found that under the totality of the circumstances, Hoak had voluntarily consented to answer some questions and, therefore, was not seized under the Fourth Amendment. *Id.* at 1270–71. *Hoak* is distinguishable from the instant case. First, the officer in *Hoak* appeared to return Hoak his license and registration while Hoak was still in the car. *Id.* at 1266. Accordingly, all Hoak had to do was drive away. There is no evidence that Hoak was repeatedly removed from his vehicle and searched. Hoak was only confronted by one police officer. While it appears that Trooper Miller primarily handled the stop, Troopers Powell and Semler and a drug dog were also on the scene. (Tr. at 186.) In other words, the fact that questioning was preceded by a statement that "you are free to leave" is not dispositive. The Supreme Court has rejected "bright line" rules in determining whether an encounter is consenual. *See Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Instead, the inquiry is fact-specific, with the result turning upon an assessment of " 'all the circumstances surrounding the encounter.' " *Id.* In this case, a careful consideration of the totality of the circumstances compels the conclusion that Trooper Miller's questioning of Fayne Padilla did not occur in the context of a consensual encounter.

once the purpose of the traffic stop was satisfied.

As explained in *United States v. Kithcart*, 134 F.3d 529, 532 (3d Cir.1998):

A Terry stop is justified when an officer has a reasonable suspicion that 'criminal activity may be afoot.' The officer's suspicion must be based on articulable facts and not merely the officer's subjective good faith.

In this case, the only facts known to Trooper Miller at the time he instructed Padilla to return to the rear of the vehicle and answer some questions were that Padilla was from Missouri, had a criminal record and was travelling on an interstate highway. These facts are not sufficient to create an objective basis for extending the scope of the traffic stop to a *Terry* investigative detention. Our Court of Appeals has observed that "it is not enough that law enforcement officials can articulate reasons why they stopped some one if those reasons are not probative of behavior in which few innocent people would engage—the factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir.1995). In this case, the mere fact of movement on an interstate highway coupled with the existence of a prior record do not eliminate a substantial portion of innocent travelers. In this regard, Trooper Miller has adduced no evidence that a substantial number of persons with criminal records are engaging in criminal activity when they travel the nation's interstate highways.

Trooper Miller needed a reasonable suspicion of criminal activity to detain the Padillas beyond the time necessary to issue Fayne Padilla a traffic warning. *Id.* at 491. "Clearly, a lawful traffic stop is not 'carte blanche' for an officer to engage in ... unjustified action." *United States v.*

*Johnson*, 63 F.3d 242, 247 (3d Cir.1995), cert. denied, 518 U.S. 1007, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996). That Trooper Miller's " 'hunch about [Fayne Padilla] proved correct is perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, *ex post facto,* a seizure that was not objectively reasonable.' " *Guzman*, 864 F.2d at 1520. Accordingly, I find that Trooper Miller violated the Padillas' Fourth Amendment rights in the second stage of the traffic stop by continuing to detain them and question Fayne Padilla after the reasons for the traffic stop had been satisfied.

The third stage of the traffic stop involved the search of the vehicle and the luggage contained in the vehicle's trunk. Trooper Miller contends that the entire search was conducted with the consent of the vehicle owner, Christy Padilla.

The permissible scope of a consensual search is limited by the terms of the consent. *Kim*, 27 F.3d at 956. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?' " *Id.* (quoting *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). As applied to this case, the pertinent inquiry is whether a reasonable person would have understood the exchange between Trooper Miller and Christy Padilla as indicating that Christy Padilla's authorization extended to a search of the car and its contents, including closed luggage. *Id.*

In this case, the exchange between Christy Padilla and Trooper Miller consisted entirely of Trooper Miller asking Christy Padilla if she would mind if he looked in the car and her saying that she

did not mind.[5] It is undisputed that Trooper Miller did not tell Christy Padilla the purpose of the search, what he was looking for, or that he intended to search the luggage and/or any contents of containers found in the vehicle.[6]

■ Under these circumstances, a reasonable person would not have understood that Christy Padilla's consent extended to luggage contained in the trunk. Even if her consent did extend to the luggage, her consent did not necessarily extend to luggage that did not belong to her. The evidence discloses that when Trooper Miller opened Fayne Padilla's gym bag, he knew that it contained only men's articles. It is undisputed that he did not ask Fayne Padilla for his consent to search his luggage. Under these circumstances, Trooper Miller cannot justify the search on the basis of consent.

■ Trooper Miller contends, alternatively, that he had probable cause to conduct a warrantless search of the vehicle. The factors that support a probable cause determination, according to Trooper Miller, are Fayne Padilla's prior record involving illegal weapons, his nervousness as manifested by being talkative, the suspect reason he articulated for traveling to New York, and the inconsistencies between his statement of reasons for traveling to New York and those given by Christy Padilla.

■ Some of these factors were discovered as a result of the unlawful detention of the Padillas. The fact that Trooper Miller learned of certain facts after unlawfully detaining the Padillas raises the interesting question of whether consideration of such facts should be precluded under a "fruit of the poisonous tree" approach. In a criminal prosecution, evidence that is derived from an illegal seizure of a person or statements made as a result of an illegal arrest may be suppressed as the "fruit" of a "poisonous tree," with the illegal act being the "poisonous tree" and the evidence derived therefrom the "fruit." *See, e.g., Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Recently, the Court of Appeals for the Second Circuit ruled that the fruit of the poisonous tree doctrine is inapplicable in § 1983 actions, explaining that the focus of the inquiry in the civil rights action must be on the question of whether there was a violation of constitutional rights and not on the link between the violation of a right and the subsequent discovery of evidence. *See Townes v. New York,* 176 F.3d 138, 145–46 (2d Cir.), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 311, 68 U.S.L.W. 3116 (Nov. 1, 1999). In reaching this result, the Second Circuit relied upon *Reich v. Minnicus,* 886 F.Supp. 674, 681–86 (S.D.Ind.1993), which explained the rationale for not applying the fruit of the poisonous tree doctrine as follows:

Section 1983 incorporates common law tort principles of damages and causa-

---

5. During the trial in this action, Trooper Miller testified that he asked Christy Padilla for consent to search the vehicle. At the habeas corpus hearing, he testified that he asked Christy Padilla if she would mind if he "looked in her vehicle." Given the circumstances of the stop, and the fact that Trooper Miller at all times maintained complete control over the scene, I find it more credible that he simply asked if he could look in the vehicle.

6. Trooper Miller conceded that he had available to him a written form to obtain written consent to the search, but did not use it. (Tr. at 235.) This form would have required Trooper Miller to disclose to Christy Padilla the items he was searching for, that she had the right to refuse to consent, and that, without her consent, he would only be able to search the vehicle with a warrant. Trooper Miller did not offer a reasonable explanation for his decision not to use the consent form.

tion, including the concept of proximate cause. When a plaintiff seeks to recover damages for injuries suffered during successive steps of state action—e.g., search, arrest, interrogation, detention, and trial—each stage of conduct must be separately judged by the constitutional standard applicable to the particular right violated, whether Fourth, Fifth or Fourteenth Amendment. The exclusionary remedy does not operate to characterize all subsequent conduct 'unconstitutional' simply because a previous step was defective. However, a plaintiff who suffers a constitutional deprivation early-on may, under § 1983, recover for his later injuries, even during later constitutional stages in the process, if the injuries are reasonably foreseeable consequences of the earlier deprivation of rights. In this analysis ..., the operative standard is the tort principle ·of proximate cause, not the exclusionary rule principle of taint and attenuation. The two are not identical. Because the taint/attenuation standard serves the deterrent purposes of the exclusionary rule, its effective limit is reached when the benefit of deterring misconduct is outweighed by the cost of losing probative evidence, which may give the standard a narrower or broader reach than the proximate cause standard depending on the particular factual context and the interest at stake. *Id.* at 684–85.

■■■■■■ I find this analysis persuasive. The "fruit of the poisonous tree" doctrine is an evidentiary exclusionary rule intended to deter unlawful conduct, but is not a substitute for determining whether a constitutional violation has occurred. Each stage of the process must be considered separately and cumulatively, with the dispositive question being whether the state of the defendant's knowledge is adequate to support his or her conduct. Traditional proximate cause principles should inform the decision of the extent of liability for a particular constitutional violation, but the existence of an antecedent constitutional violation does not mandate a determination that a person's constitutional rights were violated because the predicate knowledge that would otherwise sustain the law enforcement officer's actions was obtained illegally.

■■■■ Probable cause requires articulation of facts supporting an inference of "a fair probability that contraband or evidence of a crime will be found." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The factors upon which Trooper Miller relies, although perhaps giving rise to reasonable suspicion that something was amiss, do not support a fair inference that the vehicle or its contents contained evidence of a crime or contraband. Trooper Miller conceded that he had not observed any evidence of criminal activity before conducting the search. (Tr. at 218–19, 240–44.) While the facts learned by Miller during his separate questioning of Fayne and Christy Padilla may have warranted further detention while he conducted additional questioning, it did not support an inference of a fair probability that the vehicle contained evidence of a crime.

■■■■ Reasonable suspicions sufficient to warrant a *Terry* stop are not adequate to support a warrantless search.[7] "[I]n order

---

**7.** Trooper Miller uses the terms "reasonable suspicion" and "probable cause" almost interchangeably. Contrary to this approach, it is clear that "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Trooper Miller also impermissibly relied upon district court opinions that were reversed by the appellate courts

for probable cause to search to exist, the officer must have reasonably trustworthy information of supporting facts and circumstances such as would persuade a person of reasonable cause to believe the search is justified." *United States v. Infante–Ruiz*, 13 F.3d 498, 502 (1st Cir.1994). Absent particular information indicating that a person is transporting drugs or weapons at the time of a traffic stop, a warrantless search is generally proscribed. *Id.; see also, United States v. Angulo–Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995)(warrantless search of trunk of vehicle invalid when police only had reasonable suspicion of criminal activity).[8] Because the facts known to Trooper Miller at the time of his search of the vehicle and its compartments were not sufficient to create probable cause to believe that evidence of a crime or contraband was located in the vehicle, and the consent to "look into the vehicle" did not reasonably comprehend the extensive search undertaken by Trooper Miller, the Fourth Amendment rights of Fayne and Christy Padilla were violated by the search of the vehicle.

The final stage of the events that happened at the scene of the traffic stop occurred after the discovery of the weapons and ammunition in Fayne Padilla's gym bag. After finding the guns and ammunition, Miller left Padilla in the custody of Troopers Semler and Powell and returned to his vehicle to conduct a radio inquiry with respect to the guns and ammunition. He learned during this radio inquiry that the guns had been reported stolen. He then placed Padilla under arrest. Without "mirandizing" Padilla, Trooper Miller then asked if there was "anything else illegal in the car." Padilla responded to this question by stating that he had marijuana in Christy Padilla's purse.[9]

Armed with the information that there was marijuana in Christy Padilla's purse, Trooper Miller seized the purse and examined its contents. In the purse, as indicated by Fayne Padilla, he found marijuana.

Christy Padilla claims that the search of her purse violated her Fourth Amendment rights. To support this claim she relies

---

without so indicating in his post-trial brief. For example, at page 15 of his brief, Trooper Miller cites *United States v. Wood*, 915 F.Supp. 1126, 1141 (D.Kan.1996), in support of his assertion that he had probable cause to conduct the search. This case did not deal with probable cause, but instead concerned whether there was an objectively reasonable suspicion of illegal activity to conduct a *Terry* stop. More significantly, the district court decision that there was reasonable suspicion was reversed by the Tenth Circuit in *United States v. Wood*, 106 F.3d 942 (10th Cir.1997). The case of *United States v. Sandoval*, 770 F.Supp. 762, 768–69 (D.P.R.1991), cited at page 14 of Trooper Miller's post-trial brief, was reversed by the First Circuit in *United States v. Cardona–Sandoval*, 6 F.3d 15 (1st Cir.1993). In this era of computer-assisted legal research, it is disturbing that counsel would rely upon overturned decisions.

8. Exceptions to the probable cause requirement applicable in the event of a custodial

arrest of the occupant of an automobile, *see United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), or to search the passenger compartment of a vehicle when there is reasonable suspicion that an occupant may have immediate access to a weapon, *see Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), are plainly not applicable here.

9. This questioning plainly violated the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. *Miranda* requires that prior to asking any questions of a suspect in custody law enforcement officers must inform him that he has the right to remain silent, that his statements may be used against him at trial, that he has the right to the presence of an attorney during questioning, and that if he cannot afford an attorney, one will be appointed for him. As noted above, the parties stipulated to the dismissal of the Fifth Amendment claim prior to trial.

upon a "fruit of the poisonous tree" approach. As noted above, such an approach is not applicable in a civil rights action. Because Miller did indeed have probable cause to believe that the purse contained marijuana, his search of it did not violate Christy Padilla's Fourth Amendment rights.

█ Christy Padilla also asserts that she was subjected to an unlawful seizure after her husband was arrested. In this regard, she contends that she was ordered to follow Trooper Miller to the barracks. At no time, however, was Christy Padilla placed under arrest, nor was she ever placed in physical restraints, such as handcuffs. Based upon the totality of the circumstances, I find that Christy Padilla was not subject to a "seizure of her person" within the meaning of the Fourth Amendment.

In summary, I find that plaintiffs have established that they were subject to an unlawful seizure when Trooper Miller detained them after the purposes of the traffic stop had been satisfied; that Fayne Padilla's Fourth Amendment rights were violated by the visual inspection of his chest during the course of the traffic stop and by the search of his luggage; and that Christy Padilla's Fourth Amendment rights were violated by the search of her vehicle and the trunk. The question now is whether plaintiffs may recover damages. Miller contends that any damage award is foreclosed by the doctrine of qualified immunity.

### C. Is Miller Entitled to Qualified Immunity?

█ Miller asserts that he is entitled to qualified immunity on all of the Padillas' claims. (D's Br. at 17–19.) "'Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999). "Qualified immunity protects public officials from § 1983 civil liability so long as they 'acted reasonably under settled law in the circumstances.'" *Veilleux v. Perschau*, 101 F.3d 1, 2 (1st Cir.1996)(en banc).[10]

Miller argues that he believed that his questioning of Padilla after the issuance of a traffic warning was within the directives offered by *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177, *alloc. denied*, 533 Pa. 598, 617 A.2d 1273 (1992). (D's Br. at 18.) Nothing in the Superior Court's reasoning in *Lopez* supports Miller's conclusion that his tactic of asking questions of a motorist after issuing a warning did not violate the Fourth Amendment. In *Lopez*, the court concluded that the officer's continued detention and questioning of Lopez constituted an unreasonable seizure in violation of the Fourth Amendment. *Lopez*, 609 A.2d at 182. As in *Lopez*, Miller's questions were unrelated to the purpose of the initial stop. *Id.* "Absent reasonable grounds to suspect an illegal transaction in drugs or other serious crime, the officer had no legitimate reason for detaining Lopez or for pursuing any further investigation of him, hence, the detention ceased to be lawful at this point." *Id.* Similarly, after running a com-

---

10. Miller does not offer any reasonable support for his search of Fayne Padilla's person and I cannot discern any from this record. Padilla's identity was not in issue. There was no need to confirm the fact that the Padilla who had a record was the same Padilla he had stopped. Thus, Trooper Miller is not entitled to qualified immunity for the highly intrusive search of Padilla's person.

puter check on Padilla and writing a warning, Trooper Miller did not have a legitimate reason for detaining Padilla. Miller claims that several factors—the Padillas' point of origin, Fayne Padilla's prior record and Fayne Padilla's nervousness—lead him to conclude that criminal activity was "afloat." (Tr. at 177–78.) As noted above, these factors do not support reasonable suspicion sufficient to support detention. Accordingly, Miller's contention that he had a reasonable suspicion that criminal activity was "afloat" is unsupported by the record.

The requirements for the stop and detention that occurred here were, of course, well established in 1996. *See Karnes v. Skrutski,* 62 F.3d 485, 493 (3d Cir.1995)(holding that law pertaining to detention of motorist and search of vehicle following an otherwise lawful traffic stop were well-established by 1990). Miller could not reasonably believe that the language of *Bostick* or *Lopez* gave him the right to intimidate Padilla so that he would not feel free to terminate the encounter by confronting Padilla in an authoritative voice before Padilla had a chance to re-enter his car. Moreover, Miller understood that he needed a reasonable and articulable suspicion of criminal activity before he could detain Padilla. (Tr. at 215.) As in *Karnes,* the factors relied upon by Miller in this case "are simply too ordinary" to supply an objectively reasonable basis for Miller to have believed that he had reasonable suspicion. *Karnes,* 62 F.3d at 494–95. Nor did Miller have a sufficient basis for concluding that he had probable cause to search the vehicle or that Christy Padilla's consent afforded him carte blanche authority.

In short, a reasonable police officer could not have concluded that there was a reasonable basis for proceeding as Trooper Miller did in this case. Accordingly, Mil-

ler is not entitled to qualified immunity as to the Padillas' section 1983 claims.

## D. Are Plaintiffs Entitled to Any Damages?

 "There is no right to damages other than nominal ones for a violation of a constitutional right unless actual injury is proven." *Bolden v. Southeastern Pennsylvania Transportation Authority,* 21 F.3d 29, 34 (3d Cir.1994). "[T]he abstract value of a constitutional right may not form the basis for § 1983 damages." *Memphis Community School District v. Stachura,* 477 U.S. 299, 308, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). A damage award in a § 1983 action must be designed "to compensate *injuries caused* by the [constitutional] deprivation ...." *Carey v. Piphus,* 435 U.S. 247, 265, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)(emphasis added).

 Compensatory damages in a § 1983 action "may include not only out-of-pocket loss and other material harms, but also such injuries as 'impairment of reputation, personal humiliation, and mental anguish and suffering.'" *Stachura,* 477 U.S. at 307, 106 S.Ct. 2537; *Coleman v. Kaye,* 87 F.3d 1491, 1507 (3d Cir.1996), *cert. denied,* 519 U.S. 1084, 117 S.Ct. 754, 136 L.Ed.2d 691 (1997). While there need not be expert testimony of the existence of emotional distress or mental anguish and a causal relationship between such distress or anguish and the constitutional violation, *Bolden,* 21 F.3d at 35–36, emotional distress is not to be presumed from a mere violation of a constitutional right. *See Richard v. City of Harahan,* 6 F.Supp.2d 565, 575 (E.D.La.1998). There must be individualized proof of the fact of injury, its extent and its cause. *Id.*

 In this case, plaintiffs do not contend that they suffered any economic harm as a consequence of the violation of their constitutional rights. No claim has been

presented for damage to property or loss of property. Moreover, no evidence was presented of damage to reputation. Plaintiffs are citizens of the State of Missouri, and there is no indication that the incident of January 13, 1996 caused harm to their standing in the community in which they reside. Finally, there was no evidence of mental anguish or emotional distress. Neither plaintiff testified that he or she suffered stress, loss of sleep, embarrassment, or any other compensable form of intangible harm as a result of the violation of their constitutional rights.

"[S]peculative damages cannot be awarded in civil rights cases ...." *Bolden,* 21 F.3d at 33. "A plaintiff in a § 1983 case cannot recover for emotional distress unless he or she presents evidence of 'actual injury.'" *Id.* at 34. In the absence of competent evidence of emotional distress causally linked to the constitutional violation, damages may not be awarded. *Gunby v. Pennsylvania Electric Co.,* 840 F.2d 1108, 1121–22 (3d Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) (setting aside jury award of $15,000 in damages for emotional distress where plaintiff failed to present any evidence of emotional distress, such as sleeplessness, anxiety, depression, humiliation, etc.). Because plaintiffs in this case presented no testimony that the violation of their constitutional rights caused them any of the types of harm that are typically associated with emotional distress or mental anguish, such as sleeplessness, nightmares, embarrassment, etc., and have not presented any evidence of any economic harm, plaintiffs are not entitled to an award of compensatory damages. *See Norwood v. Bain,* 166 F.3d 243, 245 (4th Cir.)(*en banc* ), *cert. denied,* 527 U.S. 1005, 119 S.Ct. 2342, 144 L.Ed.2d 239 (1999); *Gunby,* 840 F.2d at 1122; *Richard,* 6 F.Supp.2d at 575–76.

■■■ Fayne Padilla maintains that he is entitled to damages for the period of time that he was incarcerated. This claim requires a determination of whether his incarceration was a proximate cause of the Fourth Amendment violations that occurred at the scene of the traffic stop on January 13, 1996.

As recently explained in *Olsen v. Correiro,* 189 F.3d 52, 66 n. 16 (1st Cir.1999):

'The issue of causation of damages in a § 1983 suit is based on basic notions of tort causation.' Under traditional tort principles, '[c]ausation is binary, comprising causation in fact and proximate (or 'legal') causation.' To establish causation, it must be shown both that the plaintiff's harm 'would not have occurred "but for" the [defendant's] breach [of a legal duty]' and that 'the breach proximately caused the harm, that is, [that] the defendant should bear legal responsibility for the injury.'

" '[T]he doctrine of proximate cause reflects social policy decisions based on shared principles of justice.' " *Id.* at 67 n. 18 (*quoting* Keeton, et al., *Prosser & Keeton on the Law of Torts,* § 41 at 266 (5th ed.1984)).

■■■ In this case, it could be said that "but for" the Fourth Amendment violations, Trooper Miller would not have discovered evidence of criminal activity and Fayne Padillla would, therefore, have not been incarcerated. This approach to the causation question disregards the fact that it was Fayne Padilla's possession of weapons and narcotics that provided the requisite probable cause for his incarceration. This approach also ignores the fact that the Fourth Amendment violation is remedied by the exclusion of evidence, not a proscription of the prosecution. "An illegal search or seizure affects only what evidence the state may introduce, not whether a prosecution may go forward and

a conviction be obtained.." *Chatman v. Slagle,* 107 F.3d 380, 383 (6th Cir.1997). At least as to Fayne Padilla's Fourth Amendment claims, he is seeking an adjudication of "an issue that has no bearing on the basic justice of his incarceration." *Stone v. Powell,* 428 U.S. 465, 492 n. 31, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). "A claim of illegal search and seizure under the Fourth Amendment is crucially different from any other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure ...." *Id.* at 490, 96 S.Ct. 3037.

It was Fayne Padilla's possession of firearms and narcotics, not the unconstitutional search and seizure, that resulted in his incarceration. Stated otherwise, a Fourth Amendment violation would have occurred regardless of the outcome of the search itself. It was the illegal possession of weapons and narcotics that put Fayne Padilla in jail. At trial, Fayne Padilla admitted that the firearms found in his trunk were not owned by him and that he was carrying the concealed weapons and ammunition without a license to do so. (Tr. at 69.) Under these circumstances, Trooper Miller's violation of Padilla's Fourth Amendment rights cannot be regarded as the proximate cause of Fayne Padilla's incarceration. *Cf. Olsen,* 189 F.3d at 68–70 (holding that incarceration-related damages for violation of the *Brady* rule could not be recovered where, following the setting aside of the original conviction, the plaintiff pleaded *nolo contendere* to charges pursuant to a plea agreement that resulted in imposition of a sentence of time-served on the original conviction); *Townes v. New York,* 176 F.3d at 146–47 (trial court ruling denying suppression of handguns and cocaine evidence constituted a superseding cause of the plaintiff's incarceration even though the trial court ruling

was reversed following a conditional plea of guilty).

As recognized in *Townes,* Fayne Padilla cannot recover for incarceration-related damages "for a second, independent reason: the injury he pleads (a violation of his Fourth Amendment right to be free from unreasonable searches and seizures) does not fit the damages he seeks (compensation for his ... incarceration)." *Id.* at 147. In language particularly apropos here, the *Townes* court explained:

> The goal of the [Supreme] Court's § 1983 jurisprudence has been to tailor liability to fit the interests protected by the particular constitutional right in question. In other words, § 1983 damages should be made available only for risks that are 'constitutionally relevant.' Here, there is a gross disconnect between the constitutional violations (Townes's Fourth Amendment right to be free from unreasonable searches and seizures) and the injury or harm for which Townes seeks a recovery (his subsequent conviction and incarceration). *The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all.*

> No Fourth Amendment value would be served if Townes, who illegally possessed firearms and narcotics, reaps the financial benefit he seeks. Townes has already reaped an enormous benefit by reason of the illegal seizure and search to which he was subjected: his freedom, achieved by the suppression of evidence obtained in violation of the Fourth Amendment. That benefit to Townes is merely incidental to the purpose of suppression, which is to compel law enforcement compliance with the Fourth Amendment and thereby prevent the invasions of law-abiding citizens' privacy. Now, Townes seeks damages to compen-

sate him for his conviction and time served, on top of the benefit he enjoys as a result of the suppression. That remedy would vastly over deter police officers and would result in a wealth transfer that 'is peculiar, if not perverse.'

*We conclude that constitutional tort liability under § 1983 is limited to 'a kind of injury that the [constitutional right at issue] was designed to prevent.' Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including where appropriate damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution.*

*Id.* at 148 (emphasis added). The *Townes* Court went on to explain that, under the common law, only a cause of action for malicious prosecution permitted recovery for incarceration-related damages. *Id.* at 149. Townes could not pursue a malicious prosecution claim because the evidence discovered during the illegal search and seizure indisputably established probable cause for the prosecution and the fruit of the poisonous tree doctrine was not applicable in the § 1983 action. *Id.*

An identical conclusion is compelled here. Fayne Padilla has reaped the benefit of the suppression of inculpatory evidence by his release from confinement. He should not now be rewarded in monetary damages for his possession of that inculpatory evidence that led to his incarceration. That evidence indisputably established probable cause for the prosecution, and the fruit of the poisonous tree evidentiary approach should not be applied in this civil rights action.

Where, as here, a plaintiff has failed to establish actual injury as a result of a constitutional violation, nominal damages must be awarded. *See Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("*Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of a [constitutional right] but cannot prove actual injury."); *Carey v. Piphus,* 435 U.S. 247, 265, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Accordingly, each plaintiff will be awarded nominal damages of $1.00.

Punitive damages may be awarded in a § 1983 case only where the plaintiffs have shown "evil motive or intent, or ... reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). " 'Punitive damages are never awarded as a matter of right; the finder of fact, after reviewing the entire record, is called upon to make a 'moral judgment' that the unlawful conduct warrants such an award to punish the wrongdoer and deter others.' " *Kyle v. Patterson,* 196 F.3d 695 (7th Cir.1999).

Plaintiffs have not proven that Trooper Miller acted with evil motive or intent or with a reckless or callous indifference to their federally protected rights. His examination of Padilla's chest was not the product of physical coercion. He testified that in detaining the Padillas he was trying to comply with state court precedents pertaining to traffic stops. (Tr. at 187–88.) While I find that a reasonable police officer would not have objectively believed that the conduct engaged in by Trooper Miller was proper, I also find that Trooper Miller was sincere in his belief that his conduct was proper. Under these circumstances, an award of punitive damages is not warranted. *See Richard,* 6 F.Supp.2d at 576.

## IV. Conclusion

For all the foregoing reasons, judgment will be entered in favor of each plaintiff for nominal damages in the amount of $1.00. An appropriate Order is attached.

### *ORDER*

NOW, THIS 17th DAY OF NOVEMBER, 1999, in accordance with the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED THAT:

1. The Clerk of Court is directed to enter judgment in favor of each plaintiff in the amount of One ($1.00) Dollar.

2. The Clerk of Court is directed to mark this matter CLOSED.